John BUCKLEY, Plaintiff,

v.

UNITED STATES, Defendant.

No. 92–469C.

United States Court of Federal Claims.

Aug. 19, 2003.[1]

---

1. The court's opinion on liability in this case was issued on December 6, 2001, *Buckley v. United States*, 51 Fed.Cl. 174. Subsequently, the parties in the *Buckley* case and the related case of *John Crowley v. United States*, Case No. 94–711C, submitted joint stipulations for damages and briefs regarding whether judgment should be entered for the plaintiff or for the defendant. The parties in *Buckley* have stipulated that Mr. Buckley is not entitled to FLEPRA section 404 benefits. Although implicit in its original opinion, when discussing that Mr. Buckley was not entitled to section 403 benefits, the court reissues its earlier opinion, with minimal changes, to address more explicitly that plaintiff is not entitled to section 404 benefits, and to address the form of the final judgment to be entered in the *Buckley* case.

330

Irving Kator, Kator, Parks & Weiser, P.L.L.C., Washington, D.C., Cathy A. Harris for the plaintiff.

Scott D. Austin, Heide L. Herrmann, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., James M. Kinsella, Deputy Director, David M. Cohen, Director, for the defendant. James E. Hicks, Office of Chief Counsel, Drug Enforcement Administration, of counsel.

## OPINION & FINAL JUDGMENT

HORN, Judge.

### BACKGROUND

Congress has established a special retirement system for federal law enforcement officers (LEOs), granting LEOs entitlement to an annuity at a younger age and with fewer years of service than other federal employees. 5 U.S.C. § 8336(c)(1) (2000). In addition to the special retirement system, LEOs are eligible for enhanced pay under certain circumstances, pursuant to the Federal Law Enforcement Pay Reform Act of

1990 (FLEPRA), Pub.L. No. 101–509, §§ 401–412, 104 Stat. 1389, 1465–69.[2] A "law enforcement officer" is defined in the statute as "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position." 5 U.S.C. § 8331(20). The definition of "law enforcement officer" set forth in 5 U.S.C. § 8331(20) governs the determination of whether an employee is entitled to FLEPRA benefits. See 5 U.S.C. § 5541(3)(A). Pursuant to the regulations promulgated under 5 U.S.C. § 8347, there are three categories of positions which qualify for LEO credit: (1) primary; (2) secondary supervisory; and (3) secondary administrative. Each category establishes separate requirements for entitlement. See 5 C.F.R. § 831.902 (2001).

The regulations setting forth the standards for qualification as an LEO are found at 5 C.F.R. §§ 831.903–831.911. There are two methods for claiming entitlement to law enforcement officer status in any of the three categories. 5 C.F.R. §§ 831.905–831.910. First, an agency may determine that the duties of a position meet the criteria for an LEO position. See 5 C.F.R. §§ 831.903(a), 831.904(a) (2001).[3] Alternatively, "[a]n employee who is currently serving in a position that has not been approved by OPM as a primary or secondary position, but who believes that his or her service is creditable as service in a primary or secondary position and that he or she satisfies the conditions for credit must" submit an application for credit to OPM through the current employing agency. 5 C.F.R. § 831.906(b).[4] For requests from individuals from 1990 until 1993, the employing agency also was required to submit "an advisory opinion to OPM as to

---

2. Sections 401–407 and 412 of FLEPRA are found at 5 U.S.C. § 5305 note (2000). Section 408 is codified at 5 U.S.C. §§ 4521–4523, 5541 note; section 409 at 5 U.S.C. § 8335 and 5 U.S.C. § 8425; section 410 at 5 U.S.C. §§ 5542, 5547 (repealed in part by the Technical and Miscellaneous Civil Service Amendments Act of 1992, Pub.L. No. 102–378, § 2(43)), 106 Stat. 1346, 1352; and section 411 at 5 U.S.C. § 5541.

3. Prior to 1994, the regulation allowing an agency to determine LEO status was contained in 5 C.F.R. §§ 831.905–831.906. See, e.g., 5 C.F.R. §§ 831.905–831.906 (1993).

4. Prior to 1994, the quoted language was contained in 5 C.F.R. § 831.908(b). See. e.g., 5 C.F.R. § 831.908(b) (1993).

whether it believes the individual's service in the position should or should not be credited and, if it qualifies, whether it should be a primary or secondary position." 5 C.F.R. § 831.908(b) (1993). Although not required thereafter, the agency seems to have submitted an advisory opinion on Mr. Buckley's requests, until 1996, but did do so in Mr. Buckley's case from August 31, 1996 to September 24, 1997. Coverage "in a position or credit for service will not be granted for a period greater than 1 year prior to the date that the request from an individual is received by the employing agency ...." 5 C.F.R. § 831.906(e) (2001).[5] Regarding individual requests for coverage, "[t]he employee bears the burden of proof with respect to credit under 5 U.S.C. 8336(c)." 5 C.F.R. § 831.906(a).[6]

Plaintiff, John Buckley, is one of a number of plaintiffs who have filed claims in this court for LEO credit. The plaintiffs in these cases are two hundred seventy-five Diversion Investigators (DIs), employed by the Drug Enforcement Administration (DEA), which is an agency within the Department of Justice (DOJ). The plaintiffs are classified as GS/GM–1810 and range from grade five through grade sixteen on the federal pay scale. The plaintiffs allege that the decision ·to deny them overtime compensation and benefits in accordance with FLEPRA while providing such compensation to Special Agents, GS–1811 Criminal Investigators, also employed by the DEA, is arbitrary, capricious and not in accordance with the law. The plaintiffs seek relief in this court pursuant to 28 U.S.C. § 1491 (1994 & Supp. II 1998), and the Back Pay Act, 5 U.S.C. § 5596 (2000), because of the defendant's refusal to pay them premium and overtime pay, as allegedly required pursuant to FLEPRA, administratively uncontrollable overtime (AUO), as provided by 5 U.S.C. § 5545(c)(2), and availability pay, as provided by 5 U.S.C. § 5545a. The plaintiffs argue that under the applicable law they are LEOs, entitled to receive the same compensation as other DEA LEOs, including Special Agents, based on the actual work performed

by them during the course of their employment.

Three individual cases have been selected by the parties to serve as the test plaintiffs for this matter: *John W. Partridge v. United States*, Case No. 94–819C, *John D. Crowley v. United States*, Case No. 94–711C, and *John Buckley v. United States*, Case No. 92–469C. Originally, the test cases were selected to cover three categories of plaintiffs: (1) Diversion Investigators; (2) Diversion Group Supervisors; and (3) those from the above two categories who transferred to administrative positions. In addition, the test cases represent plaintiffs from DEA offices in three different geographical regions: Los Angeles, California; Boston, Massachusetts; and Arlington, Virginia. According to the plaintiff, Mr. Buckley's case was initially "selected for trial as representative of those plaintiffs in the instant case who had transferred initially from Diversion Investigator positions to administrative positions, either directly or from supervisory positions." In contrast, "Mr. Crowley's case was selected for trial as representative of those plaintiffs who had filed suit in the above-captioned cases and who transferred from Diversion Investigator primary positions to supervisory positions in DEA." However, as discussed in this opinion, Mr. Buckley's claims require an analysis of whether his previous positions in both the administrative and the supervisory categories meet the standard for LEO credit. As the court has interpreted the statute and regulations, Mr. Buckley's claims now raise issues previously reserved for Mr. Crowley's case.

Mr. Buckley raises the following claims: (1) qualification for a special rate of pay for employees at grades GS–3 through GS–10 pursuant to FLEPRA section 403, 5 U.S.C. § 5305 note (2000); (2) qualification for a special rate of pay for employees who were posted for duty in one of eight specified metropolitan areas pursuant to FLEPRA section 404, 5 U.S.C. § 5305 note; (3) eligibility for premium pay for working scheduled

---

**5.** Prior to 1994, the quoted language was contained in 5 C.F.R. § 831.908(e). *See. e.g.,* 5 C.F.R. § 831.908(e) (1993).

**6.** Prior to 1994, the quoted language was contained in 5 C.F.R. § 831.908(a). *See. e.g.,* 5 C.F.R. § 831.908(a) (1993).

overtime work compensated at the greater of one hundred fifty percent of the GS–10 hourly pay rate, or their own hourly pay rates, pursuant to FLEPRA section 410, 5 U.S.C. §§ 5542, 5547; (4) qualification for premium pay on an annual basis for AUO, at an appropriate percentage, not in excess of twenty-five percent, of such part of the basic pay for the position as does not exceed the minimum rate of basic pay for GS–10, pursuant to 5 U.S.C. § 5545(c)(2); and (5) eligibility for premium pay given to ensure the availability of criminal investigators for unscheduled duty in excess of a forty hour work week at a rate of twenty-five percent of the rate of basic pay for the position, pursuant to 5 U.S.C. § 5545a.[7]

DEA's predecessor, the Bureau of Narcotics and Dangerous Drugs (BNDD), established the Diversion Control program in 1971, following passage of the Controlled Substances Act of 1970 (CSA), Pub.L. No. 91–513, 84 Stat. 1242 (codified at 21 U.S.C. §§ 801 *et seq.* (1994 & Supp. V 1999)). One of the purposes of the CSA was to combat the illegal diversion of controlled substances to addicts and drug dealers by doctors, pharmacists, manufacturers and distributors. The Act established requirements for the use, storage and distribution of controlled substances, and made the diversion of drugs a violation of law punishable under the criminal statutes of the United States. Duties of DIs include investigating violations of criminal laws with respect to the diversion of drugs into illegal channels and assuring compliance with the requirements created by the CSA.

DIs have not been considered by the DEA as meeting the definition of an LEO for premium pay purposes. DIs have not been paid under special pay provisions of FLEPRA and have not received pay for AUO pursuant to 5 U.S.C. § 5545(c)(2) (2000). DEA has adopted the position that once an employee is determined to be entitled to LEO retirement credit for a period of time subject to FLEPRA, that employee will be paid premium pay pursuant to FLEPRA as follows. DEA will pay the employee premium pay pursuant to FLEPRA section 403, 5 U.S.C. § 5305 note, for any period of time, subsequent to the effective date of FLEPRA section 403, for which it is determined: (1) that the employee is entitled to LEO retirement credit and (2) that the employee satisfies the requirements of FLEPRA section 403. DEA will pay the employee premium pay pursuant to FLEPRA section 404, 5 U.S.C. § 5305 note, for any period of time, subsequent to the effective date of FLEPRA section 404, for which it is determined: (1) that the employee is entitled to LEO retirement credit and (2) that the employee satisfies the requirements of FLEPRA section 404 and 5 C.F.R. §§ 531.301–531.306 (2001).[8] DEA will pay the employee premium pay pursuant to FLEPRA section 410, 5 U.S.C. §§ 5542, 5547, for any period of time, subsequent to the effective date of FLEPRA section 410, for which it is determined: (1) that the employee is entitled to LEO retirement credit and (2) that the employee satisfies the requirements of FLEPRA section 410. Each DI who meets the requirements for premium pay pursuant to FLEPRA, discussed above, will be paid, retroactively, the amount to which he or she is entitled.

Of the DIs with cases pending in this court, as of October 13, 1995, one hundred forty-five had applied to the DEA and/or the Justice Management Division (JMD), a division of the DOJ, for LEO retirement credit under the Civil Service Retirement System (CSRS), as provided by 5 U.S.C. §§ 8331(20), 8336(c) (2000), and under the Federal Employee Retirement System (FERS), as provided by 5 U.S.C. §§ 8401(17), 8412(d). The JMD only had issued final orders on nine of the one hundred forty-five pending applications. Subsequently, JMD issued additional

---

7. Although a FLEPRA section 407 claim is discussed in some of the papers filed with the court, this claim is not mentioned in the plaintiff's second amended complaint which was filed on March 5, 2001. Because the second amended complaint establishes the claims before the court, the court will not address the merits of a FLEPRA section 407 claim.

8. Subpart C—Special Pay Adjustment for Law Enforcement Officers, was first published at 57 Fed.Reg. 2432 (Jan. 22, 1992) (codified as amended at 5 C.F.R. §§ 531.301–531.305 (1993)).

decisions, but as discussed at numerous status conferences with the court, the rate of decision making at DOJ was, at best, extremely slow. All nine of the applications decided by 1995 were denied, and each affected DI filed an appeal to the Merit Systems Protection Board (MSPB). The nine cases were consolidated on appeal, and two of the cases, James T. Hannon and Ronald J. Townsend, proceeded to a hearing on December 11, 1995. The remaining seven appeals were stayed at the MSPB pending final resolution of the two designated cases. On April 30, 1997, MSPB Administrative Judge Jenkins issued a decision reversing the JMD's denial of LEO retirement credit, concluding that both plaintiffs were entitled to LEO retirement credit under their respective retirement systems. The government filed a Petition for Review before the MSPB on June 3, 1997. The MSPB issued a final decision in the case of James T. Hannon on June 11, 1999, reversing the Administrative Judge's decision. The MSPB decision found that Mr. Hannon was not entitled to LEO retirement credit under the CSRS, pursuant to 5 U.S.C. §§ 8331(20), 8336(c), consistent with the JMD's denial of LEO retirement credit. *Hannon v. Dep't of Justice*, 82 M.S.P.R. 315 (1999).[9] The MSPB issued a final decision in the case of Ronald J. Townsend on August 31, 1999, also reversing the Administrative Judge's decision, similarly holding that he was not entitled to LEO retirement credit under the FERS, pursuant to 5 U.S.C. §§ 8401(17), 8412(d). *Townsend v. Dep't of Justice*, 83 M.S.P.R. 427 (1999). On December 7, 2000, the United States Court of Appeals for the Federal Circuit affirmed the MSPB's decision which had found that James T. Hannon was not entitled to LEO credit. *Hannon v. Dep't of Justice*, 234 F.3d 674 (Fed.Cir.2000), *reh'g denied* (May 1, 2001) (refusing to find that the Board's factual determinations were not based on substantial evidence and declaring that the Board's application of the law to those facts was not arbitrary and capricious, an abuse of discretion or otherwise not in accordance with the law). On June 6, 2001, the United States Court of Appeals for the Federal Circuit affirmed the MSPB's decision regarding Ronald J. Townsend. *Townsend v. OPM*, 13 Fed.Appx. 962 (Fed.Cir. 2001) (table) (using the substantial evidence, arbitrary or capricious, abuse of discretion or otherwise not in accordance with the law standards). On August 29, 2001, the plaintiffs in *Hannon* and *Townsend* petitioned the United States Supreme Court for a writ of certiorari to review the Federal Circuit's decision. 534 U.S. 1065, 122 S.Ct. 665, 151 L.Ed.2d 579 (2001).

In the *Buckley* case before this court, the defendant filed a motion to dismiss, which the court denied in its opinion of October 6, 2000. Before the case was tried, the parties also filed briefs regarding an issue raised by the plaintiff and jointly stipulated to by the parties as follows:

> [w]hether the previous decision of the Office of Personnel Management to grant plaintiffs primary law enforcement officer credit is sufficient to satisfy plaintiffs' burden of demonstrating, for purposes of obtaining secondary law enforcement officer credit, that they previously occupied a primary law enforcement officer position or whether plaintiffs must demonstrate, through evidence of their primary job activities, that the primary position they occupied was a law enforcement officer position.

At the pre-trial conference, the court informed the parties that the question raised by the plaintiff's argument would be addressed in the court's final opinion on the merits. The test case of *Buckley v. United States* was tried in Washington, D.C. This opinion addresses each of Mr. Buckley's claims.

Plaintiff John Buckley began working with BNDD in April 1972. Initially, Mr. Buckley worked in New York City, from 1972 to 1983. He was an investigator from April 1972 until October 1979, at which time he was promoted to the position of a group supervisor. Mr. Buckley was a group supervisor until March 1983, when he was transferred to DEA head-

---

9. Although the decisions of the MSPB are officially published in the Decisions of the United States Merit Systems Protection Board (M.S.P.B.), following the Federal Circuit's lead, citations are made to the United States Merit Systems Board Reporter (M.S.P.R.).

quarters in Arlington, Virginia. There, he worked as a staff coordinator for the Office of Diversion Control. He returned to New York to work as a group supervisor of DIs from August 1985 until October 1988, when he transferred back to DEA headquarters as the Deputy Chief of Diversion Operations. Mr. Buckley remained in that position until mid–1989, when Diversion Operations split into drugs and chemicals. Mr. Buckley became the Deputy Chief of Chemical Operations and remained in that position until June 30, 1991, when he was transferred to the Office of Inspections. According to the papers filed with the court, Mr. Buckley continues to work at the Office of Inspections as an Inspector. Also, according to the parties, Mr. Buckley's retirement benefits arise under the CSRS, pursuant to 5 U.S.C. §§ 8331(20), 8336(c) (2000).

On February 24, 1984, OPM granted Mr. Buckley primary LEO credit for his work as a DI from January 1, 1975 through October 20, 1979, secondary supervisory LEO credit for his work as a Diversion Group Supervisor from October 21, 1979 to March 26, 1983 and secondary administrative LEO credit for his work as a Staff Assistant from March 27, 1983 to February 27, 1984. On August 27, 1992, OPM granted Mr. Buckley secondary administrative LEO credit for his work as a Staff Assistant from February 24, 1984 to July 21, 1985, secondary supervisory LEO credit for his work as a Group Supervisor from July 22, 1985 to October 22, 1988 and secondary administrative LEO credit for his work as Deputy Chief of Diversion Operations from October 23, 1988 to August 23, 1989.[10] According to DEA personnel staff members, including the Deputy Assistant Administrator for the Office of Personnel for the DEA, in considering Mr. Buckley's applications for LEO credit, OPM based its decision to award LEO credit to Mr. Buckley on whether he had spent a majority of his time involved in criminal investigations.

In December 1993, the responsibility for determining creditable service was transferred from OPM to the relevant employing agency. In Mr. Buckley's case, the Justice Management Division (JMD), a division of the DOJ, acquired the responsibility for credit determinations. Also in 1993, the Merit Systems Protection Board (MSPB), the Board responsible for review of JMD's decisions, adopted what it defined as a "significantly narrower" standard for defining LEO credit. *See Bingaman v. Dep't of Treasury*, 127 F.3d 1431, 1438 (Fed.Cir.1997). The Board established a six part test for determining whether an employee meets the definition of achieving LEO status for purposes of entitlement to LEO retirement credit. *See Hobbs v. OPM*, 58 M.S.P.R. 628, 633 n. 5 (1993). The MSPB followed and published a number of subsequent decisions utilizing the narrower approach to determine eligibility for LEO retirement credit. *See, e.g., Bremby v. Dep't of the Navy*, 81 M.S.P.R. 450, 453 (1999); *Taylor v. Dep't of Treasury*, 68 M.S.P.R. 693, 696 (1995); *Ferrier v. OPM*, 66 M.S.P.R. 241, 244 (1995); *Peek v. OPM*, 63 M.S.P.R. 430, 432 (1994). *aff'd* 59 F.3d 181 (Fed.Cir.1995) (table); *Sauser v. OPM*, 59 M.S.P.R. 489, 492 (1993). The United States Court of Appeals for the Federal Circuit in *Bingaman v. Department of Treasury* affirmed the MSPB's adoption of the narrower standard, noting that "the set of factors the [MSPB] has developed captures the essence of what Congress intended." *Bingaman v. Dep't of Treasury*, 127 F.3d at 1436, 1438.

On September 13, 1990, Mr. Buckley submitted an application for additional LEO credit, requesting that his service from August 24, 1989 to September 13, 1990 be credited under 5 U.S.C. § 8336(c) (1988). From September 13, 1990 until September 24, 1997, Mr. Buckley submitted an application to OPM through the DEA on an annual basis, requesting LEO credit for the previous year until the date of the application. During this period of time, Retha Fulmore was an employee relations specialist and was involved in reviewing the applications for 8336(c) credit submitted to the DEA, determining if the application met the criteria for LEO credit and making a recommendation to OPM for a decision. On July 29, 1994, Ms. Fulmore

---

**10.** At the trial, and on several other occasions, defendant's counsel stated emphatically that: "Any of the credit that Plaintiff has already received, we're not claiming that he has to give any of that credit back."

sent a letter to Stephen R. Colgate, Assistant Attorney General for Administration for JMD, stating that from August 24, 1989 through September 13, 1990:

> DI Buckley continued to occupy the position of Deputy Chief, Diversion Operations, a position he held when he received prior coverage from OPM in 1989. Since OPM had determined that DI Buckley's service in this position met the definition of an administrative position, continued law enforcement coverage in the administrative category for this service is recommended.

In this same letter, however, Ms. Fulmore wrote that "DI Buckley's position of Inspector does not meet the definition for an administrative position. Accordingly, law enforcement coverage in the administrative category is not recommended for the period July 1, 1991 through September 1, 1993." On February 5, 1997 and on March 10, 1997, Ms. Fulmore sent subsequent memoranda to Mr. Colgate regarding Mr. Buckley's requests for LEO credit from September 1, 1994 until August 30, 1996. In these memoranda, Ms. Fulmore again informed Mr. Colgate that law enforcement coverage was not recommended for Mr. Buckley's service as an Inspector. There is no evidence in the record that DEA submitted an advisory opinion regarding Mr. Buckley's request for credit from August 31, 1996 to September 24, 1997.

On August 16, 1999, JMD issued a final decision denying Mr. Buckley's requests for LEO credit from August 24, 1989 to September 1997. The plaintiff appealed JMD's decision to the MSPB. On December 15, 1999, the MSPB dismissed Mr. Buckley's appeal, without prejudice. According to the MSPB Administrative Judge, he initiated the dismissal without prejudice because of a pending appeal in the United States Court of Appeals for the Federal Circuit on "the primary LEO service creditability issue" in *Hannon v. Department of Justice*, 234 F.3d 674.

Mr. Buckley has never received overtime pay, AUO or availability pay, but he has received some compensatory time for some of the hours he worked beyond the forty hour work week in early 1983, from 1985 to 1988, and from 1991 to the present in the Office of Inspections.

Plaintiff currently seeks LEO credit in the secondary administrative category from August 24, 1989 to the present. According to the briefs submitted by the plaintiff on the pre-trial motion, plaintiff argues that OPM's previous decision granting Mr. Buckley primary credit is sufficient to satisfy plaintiff's burden of demonstrating, for purposes of obtaining secondary law enforcement officer credit, that he previously occupied a primary law enforcement officer position. In support of Mr. Buckley's claim for LEO credit, the plaintiff argues that "Mr. Buckley satisfies the condition in 5 U.S.C. § 8331(20) [(2000)] in that he was a law enforcement officer in a primary position as a Diversion Investigator in the New York Diversion field office from 1975 to 1979 and the duties of his position were primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." In addition, the plaintiff contends that if OPM's previous decision granting Mr. Buckley primary credit is not given preclusive effect, the plaintiff still meets the new standard as expressed by the United States Court of Appeals for the Federal Circuit. Plaintiff finally argues that because Mr. Buckley meets the definition of a "law enforcement officer" under 5 U.S.C. § 8331(20), Mr. Buckley is entitled to the benefits which flow from LEO status, including enhanced rates of pay pursuant to FLEPRA §§ 403 and 404. In addition, Mr. Buckley seeks overtime pay under 5 U.S.C. § 5542(a)(4), AUO pay under 5 U.S.C. § 5545(c)(2) from August 2, 1985 to the present, and availability pay under 5 U.S.C. § 5545a from October 1994 to the present.

In response, defendant argues that "Mr. Buckley is neither entitled to LEO credit nor to FLEPRA benefits." Regarding the plaintiff's claims for pay in excess of the forty hour work week, defendant contends that the plaintiff is not entitled to overtime pay pursuant to 5 U.S.C. § 5542(a)(4) (2000), AUO under 5 U.S.C. § 5545(c)(2), or availability pay pursuant to 5 U.S.C. § 5545a.

## DISCUSSION

■ As an initial matter, the court considers the issue raised by the parties' briefs submitted prior to trial. The parties jointly stipulated to the issue regarding what the plaintiff must prove to meet the transfer requirement of 5 C.F.R. § 831.904 (2001) as follows:

[w]hether the previous decision of the Office of Personnel Management to grant plaintiffs primary law enforcement officer credit is sufficient to satisfy plaintiffs' burden of demonstrating, for purposes of obtaining secondary law enforcement officer credit, that they previously occupied a primary law enforcement officer position or whether plaintiffs must demonstrate, through evidence of their primary job activities, that the primary position they occupied was a law enforcement officer position.

The parties each have raised several arguments to resolve this issue.

## I. TRANSFER REQUIREMENT

The defendant argues that:

the plain language in 5 C.F.R. § 831.904(a)(1), (2) (2001) requires, for entitlement to secondary coverage, that an employee have transferred into the secondary position *from a primary LEO position* (the transfer requirement). Thus, it is necessary to consider whether [Mr. Buckley was] in [a] primary LEO position[ ], and, under *Bingaman*,[11] this inquiry must be made using the *current* legal standard without regard to an earlier determination made under a previous standard. In short, OPM's decision to grant primary LEO credit to these individuals was based upon a legal standard that is no longer current, and that decision is not tantamount to a finding that they were primary LEOs under current law, which *Bingaman* requires.

(emphasis in original).

In contrast, the plaintiff argues that:

The issue of primary time is not open on direct review. OPM long ago determined that the plaintiffs, Buckley and Crowley, had demonstrated that their duties in their primary positions were those of law enforcement officers. The plaintiffs should not be required to make that demonstration again under a standard that was not applicable at the time the decision was made . . . .

On this basis the OPM decision may not be re-litigated.

In the controlling statute, a law enforcement officer is defined as "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position." 5 U.S.C. § 8331(20) (2000). Pursuant to 5 U.S.C. § 8347, OPM has issued regulations providing guidelines for determining entitlement to LEO credit. *See* 5 C.F.R. §§ 831.901–831.914 (2001). The regulations at 5 C.F.R. § 831.904(a)(1) establish the transfer requirement for secondary credit eligibility as follows: "Employee is transferred directly (i.e., without a break in service exceeding 3 days) from a primary position to a secondary position . . . ." 5 C.F.R. § 831.904(a)(1). Thus, despite the fact that the plaintiff seeks only secondary credit, the conditions for earning secondary credit include a determination regarding whether the employee occupied a primary position.

Upon review of the plain language of the regulation, it is unclear whether the transfer requirement of § 831.904(a)(1) (2001) must be met each time an employee submits an application for LEO credit to OPM, even if the employee has previously been deemed to have met the transfer requirement in prior determinations regarding eligibility for LEO credit. Plaintiff argues that:

once Mr. Buckley was credited with having transferred to a supervisory position as

---

**11.** Now also under *Watson v. Department of the Navy*, 262 F.3d 1292 (Fed.Cir.2001), decided August 17, 2001 and *Hall v. Department of the Treasury*, 264 F.3d 1050 (Fed.Cir.2001), decided

September 4, 2001. The plaintiffs in *Watson* filed a petition for a writ of certiorari with the United States Supreme Court on November 15, 2001.

defined by 5 C.F.R. § 831.903(c)(3)(i) (1988), he should have been "deemed to have met the transfer requirements for all subsequent employment in supervisory/administrative law enforcement positions" pursuant to 5 C.F.R. § 831.903(d) (1988). The Court must therefore find that Mr. Buckley's service subsequent to 1988 is covered as a law enforcement officer pursuant to 5 C.F.R. § 831.903(c)(3)(i) (1988).

In response, defendant argues that

the regulations in effect during the time period in which LEO credit is being claimed apply. Although the regulations relied upon by Mr. Buckley might be applicable to a claim for LEO credit for the October 1979 through March 1983 time period, that is not the period of time for which Mr. Buckley is currently seeking LEO credit.

A review of the history of the regulation at issue shows that a previous determination that the employee has met the transfer requirement does not preclude the subsequent review of the transfer requirement for later applications. The version of 5 C.F.R. § 831.903(c)-(d) from 1981 until 1987 provides:

(c) "Law enforcement officer" also includes an employee who is transferred to a position the primary duties of which are not the investigation, apprehension, or detention of persons suspected or convicted of offenses against the criminal laws of the United States, . . . if—

(1) Service in the position transferred to follows service in a law enforcement position without—

(i) A break in service of more than three days; or

(ii) Intervening employment that was not as a law enforcement officer;

(2) The duties of the position transferred to are in the law enforcement line of work in an organization with responsibility for the investigation, apprehension, or detention of persons suspected or convicted of offenses against the criminal laws of the United States; and

(3) The position transferred to is—

(i) Supervisory—one which requires a duty of supervising subordinate employees who are directly engaged in the investigation, apprehension, or detention of persons suspected or convicted of offenses against the criminal laws of the United States; or

(ii) Administrative—one which includes an executive or managerial position and may include a clerical, technical, semiprofessional, or professional position of a type also found in organizations with no law enforcement responsibilities: *Provided,* That experience as a law enforcement officer is a basic qualification for the administrative position.

(d) A law enforcement officer, as defined in section 8331(20) of title 5, United States Code, who has transferred to a position identified by paragraph (c) of this section [which defines supervisory and administrative positions], under the conditions described in this paragraph, shall be deemed to have met the transfer requirements for all subsequent employment in supervisory/administrative law enforcement positions, except for any period of reemployment as an annuitant under title 5, United States Code, section 8335(b) or section 8336(c).

*See. e.g.,* 5 C.F.R. § 831.903(c)-(d) (1987). The applicable regulations issued after 1987 to the present do not contain the same transfer provisions or the provision which waives consideration of the transfer requirement when reviewing future applications for secondary credit if the employee has already met the transfer requirement.

The United States Supreme Court, in *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), discussed the time period during which regulations should be given effect. The *Bowen* Court stated: "Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* at 209, 109 S.Ct. 468. However, an earlier case issued by the Supreme Court contained apparently contradictory language and held that "a court is to apply the law in effect at the time it renders its decision, unless doing

so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond Sch. Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). The United States Court of Appeals for the Federal Circuit has considered the apparent inconsistency between *Bowen* and *Bradley* and decided to follow *Bowen*, stating that "[w]e prefer the longer-standing rule that retroactivity is not presumed." *Sargisson v. United States*, 913 F.2d 918, 923 (Fed.Cir.) *reh'g denied* (1990).

Moreover, the United States Supreme Court recently considered whether a statute may be given retroactive effect and after explicitly citing *Bowen*, held that "[a] statute may not be applied retroactively, however, absent a clear indication from Congress that it intended such a result." *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 2288, 150 L.Ed.2d 347 (2001). The *St. Cyr* Court also adopted a two-step analysis for determining whether a statute has an impermissible retroactive effect. *Id.* The first step involves ascertaining "whether Congress has directed with the requisite clarity that the law be applied retrospectively. The standard for finding such unambiguous direction is a demanding one." *Id.* (citation omitted). The second step "demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Id.* at 2290 (quoting *Martin v. Hadix*, 527 U.S. 343, 357–358, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994))). Rejecting retroactivity, the *St. Cyr* Court adopted the principle that "'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place ....'" *Id.* at 2288 (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)). The *St. Cyr* Court pointed out that: "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly ...." *Id.* Although the question presented by Mr. Buckley's employment history is more strictly one of prospectivity, instead

of retroactivity, the underlying theories of how to achieve notice to all parties and, therefore, fairness, apply in both situations. The change in 5 C.F.R. § 831.903(d) after the revisions in 1988, so that the regulation no longer waived consideration of the transfer requirement when reviewing future applications for secondary credit if the employee already had met the transfer requirement, suggests a change in status regarding of what provisions both parties had notice and under which provisions their conduct should be judged. *Compare* 5 C.F.R. § 831.903(c)-(d) (1987) *with* 5 C.F.R. § 831.904 (1988).

"In determining the meaning of such regulations, rules of interpretation applicable to statutes are appropriate tools of analysis." *Gen. Elec. Co. v. United States*, 221 Ct.Cl. 771, 778, 610 F.2d 730, 734 (1979); *accord Wronke v. Marsh*, 787 F.2d 1569, 1574 (Fed. Cir.) (stating that for the interpretation of regulations, just as in the interpretation of statutes, courts must begin with their plain language), *cert. denied*, 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986); *see also Rice v. Martin Marietta Corp.*, 13 F.3d 1563, 1568 (Fed.Cir.1993) (noting that the canon of statutory construction which states that "where the text permits, statutes dealing with similar subjects should be interpreted harmoniously" is "equally applicable" to regulations).

In the present case, neither the regulations at issue nor the authorizing statute discuss the time period during which the regulation will be applicable. In addition, the regulations from 1988 onward may deprive Mr. Buckley of the benefits of being deemed to have met the transfer requirements for the purposes of earning credit for future supervisory or administrative positions. Thus, applying a binding retroactive overlay from regulations issued after 1987 "'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past ....'" *INS v. St. Cyr*, 121 S.Ct. at 2290–91 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. at 269, 114 S.Ct. 1483 (quoting *Soc'y for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H.

1814) (Story, J.))). However, even if the regulations at issue for 1988 to 2001, which do not contain the waiver provision, should not be applied retroactively, the benefits of the 1981 and 1987 regulations, which contain the provision waiving the consideration of the transfer requirements, would not apply to the present case because the transfer requirements were changed from 1988 forward.

Mr. Buckley's conduct which triggers the legal consequences imposed by the regulations occurs at multiple points in time. Mr. Buckley transferred into a supervisory or an administrative position in 1979 (to group supervisor), in 1983 (to staff coordinator), in 1985 (to group supervisor), and in 1988 (to Deputy Chief of Diversion) pursuant to the regulations in effect during those periods of time. The times of the transfers are relevant to determine which regulations govern and if these transfers are sufficient for meeting the transfer requirement for all future applications for credit in supervisory or administrative positions. In 1988, the substance of the regulations was significantly revised. The 1988 version of the C.F.R. established and defined "primary positions" and "secondary positions" and set forth a different transfer requirement as follows: "Employee is transferred directly (i.e., without a break in service exceeding 3 days) from a primary position to a secondary position . . . ." 5 C.F.R. § 831.904(a)(1) (1988).

From 1988 until 2001, the regulations define a "primary position" as "a position whose primary duties are . . . investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." *Compare* 5 C.F.R. § 831.902 (1988) *with* 5 C.F.R. § 831.902 (2001). A "secondary position" is defined as a position that:

(1) Is clearly in the law enforcement or firefighting field;

(2) Is in an organization having a law enforcement or firefighting mission; and

(3) Is either—

(i) Supervisory; i.e. a position whose primary duties are as a first-level supervi-

sor of law enforcement officers or firefighters in primary positions; or

(ii) Administrative; i.e., an executive, managerial, technical, semiprofessional, or professional position for which experience in a primary law enforcement or firefighting position, or equivalent experience outside the Federal government, is a prerequisite.

*Compare* 5 C.F.R. § 831.902 (1988) *with* 5 C.F.R. § 831.902 (2001).[12]

Although the provision applicable before 1988, waiving consideration of the transfer requirements for "all subsequent employment in supervisory/administrative law enforcement positions," should apply prospectively once Mr. Buckley had transferred into a supervisory or administrative position, the transfer requirements which were imposed pre–1988 and which could be waived were changed resulting in a new transfer requirement included in the regulations from 1988 to the present. *Compare* 5 C.F.R. § 831.903(d) (1987) *with* 5 C.F.R. 904(a)(1) (2001). From 1988 to the present, a different transfer requirement has been established—transfer from a primary position to a secondary position. *See. e.g.,* 5 C.F.R. 904(a)(1) (2001). The new definitions of primary and secondary positions result in different transfer requirements. For example, the new definition of a secondary position requires a transfer into a position that "[i]s clearly in the law enforcement or firefighting field" and is "in an organization having a law enforcement or firefighting mission." *See* 5 C.F.R. § 831.902. Moreover, the definition of an administrative secondary position significantly changed in 1988. Because of the changes in the transfer requirement in 1988, any waiver of the previous transfer requirement cannot fulfill the plaintiff's obligation to satisfy the current transfer requirement. The C.F.R. after 1988 has never contained a provision waiving the consideration of this new transfer requirement. Even if the waiver provision in effect from 1981 until 1987 applied to Mr. Buckley's applications for credit during that time period, this waiver provision does not permit Mr. Buckley to escape the current

---

**12.** Although the numbering system for the subparts has been revised from 1988 until 2000, the substance of the regulations during this time period is identical.

transfer requirement, and Mr. Buckley has the burden to prove that he meets the current transfer requirement, unless specifically grandfathered by statute or regulation.

Thus, the transfer requirement for obtaining secondary credit must include a determination that the employee previously occupied a primary position and had been transferred directly (within three days) from that primary position. Mr. Buckley's applications submitted in 1990 for secondary credit for work starting in 1989 until the present have not been decided and remain open on direct review. Mr. Buckley's occupation of a primary position is a requirement for obtaining secondary credit and interpretations of federal law apply retroactively to all open cases. Therefore, the pertinent statutes and regulations and, if applicable, the factors discussed in recent cases including *Hall v. Department of the Treasury*, 264 F.3d 1050 (Fed.Cir. 2001), *Watson v. Department of the Navy*, 262 F.3d 1292 (Fed.Cir.2001) and *Bingaman v. Department of Treasury*, 127 F.3d 1431 (Fed.Cir.1997), which offer guidance on how to determine LEO status, and which are discussed more fully below, are to be considered to determine whether Mr. Buckley was in an LEO creditable primary position and, therefore, satisfies the transfer requirement for eligibility for secondary credit.

## II. JUDICIAL ESTOPPEL

▮ Plaintiff argues that the principle of judicial estoppel should apply to preclude the government from taking the position that he is not entitled to primary LEO credit, a position that he alleges is inconsistent with defendant's prior position regarding crediting primary time. Mr. Buckley previously was awarded and received primary LEO credit from 1975 to 1979 and secondary credit from 1979 to 1989. The United States Court of Appeals for the Federal Circuit has explained the doctrine of judicial estoppel as follows:

where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed. *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed.

578 (1895); *Wang Lab., Inc. v. Applied Computer Sciences, Inc.,* 958 F.2d 355, 358 (Fed.Cir.1992). Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants. *See, e.g., Wang Lab., Inc.,* 958 F.2d at 359; *In re Cassidy,* 892 F.2d 637, 641 (7th Cir.), cert. denied, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990) . . . .

*Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.) *reh'g denied* (1996). A party has successfully asserted a position when that party has:

received a benefit from the previously taken position in the form of judicial success. *See Jackson Jordan, Inc. v. Plasser Am. Corp.,* 747 F.2d 1567, 1579, 224 USPQ 1, 10 (Fed.Cir.1984) ("In all precedent cited to us and which we have researched independently, the party against whom estoppel is invoked received some benefit from the previously taken position, i.e., he 'won' because of it.") . . . .

*Water Techs. Corp., v. Calco, Ltd.,* 850 F.2d 660, 665–66 (Fed.Cir.) *cert. denied* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988).

▮ In the present case, the government received no benefit from taking the position that the plaintiff was entitled to primary credit. The DEA and the OPM agreed with the plaintiff's application of the law, and the plaintiff was the one who benefitted from obtaining LEO coverage. Furthermore, the defendant has not "urge[d]" a particular position in a legal proceeding." *Data Gen. Corp. v. Johnson,* 78 F.3d at 1565. The plaintiff applied to the OPM through the DEA for LEO credit, the DEA reviewed the plaintiff's request and recommended that the plaintiff's request be granted and the OPM determined that the plaintiff met the standard for receiving credit. At no point during this process regarding the plaintiff did the DEA or the OPM assert a position in a legal proceeding. The defendant also has asserted a good faith argument that the change in the legal position of the MSPB, as affirmed by the United States Court of Appeals for the Federal Circuit, supported the same change in position regarding the plaintiff's entitlement to primary LEO credit. Accordingly, defendant's

positions are not inherently contradictory because the change in the interpretation of the law regarding primary time by the MSPB, as affirmed by the Federal Circuit, was the DOJ's justification for adjusting its position at the administrative level. Thus, judicial estoppel does not preclude the defendant from taking the position that the plaintiff did not occupy a primary position under the current standard.

## III. COLLATERAL ESTOPPEL

Plaintiff also argues that "[c]ollateral estoppel requires that the Department of Justice be held to the decision recommended by the Department and made by OPM to grant plaintiffs primary law enforcement credit." In response, defendant contends that "*actual litigation* is necessary for the doctrine of collateral estoppel to be applicable" and that "the plaintiffs here received their primary credit without litigation; OPM voluntarily granted the plaintiffs' application for LEO credit without litigating the matter." (emphasis in original).

Defendant argues that "the Supreme Court's decision in *[Commissioner v.] Sunnen* unequivocally states that collateral estoppel does not apply for future purposes when there has been a change in controlling legal principles." In *Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), the Court considered whether a 1935 determination of tax liability on royalties from a 1928 license contract would preclude the determination of tax liability on royalties based on the 1928 contract and other contracts, all distributed after a change in the law. In finding that collateral estoppel would not preclude the re-litigation of tax liability on royalties distributed after the change in law, the Court held that "a subsequent modification of the significant facts or a change or development in the controlling legal principles may make [a previous] determination obsolete or erroneous, at least for future purposes." *Id.* at 599, 68 S.Ct. 715. However, the Court also acknowledged that an issue that was essential to the previous judgment and actually determined in the previous proceeding will bind a court in a subsequent proceeding even under a different

cause of action. *Id.* at 601, 68 S.Ct. 715. Regarding a change in the facts, the *Sunnen* Court detailed the situations in which collateral estoppel would not apply:

[I]f the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result . . . .

*Id.* (footnote omitted). Thus, the Court reasoned that separable facts or instruments or transactions in separable form would defeat the application of collateral estoppel in a subsequent proceeding.

The defendant relies on the United States Court of Appeals for the Federal Circuit decision in *Bingaman v. Department of Treasury*, 127 F.3d 1431 (Fed.Cir.1997) in support of its argument that collateral estoppel does not apply in this case. In *Bingaman*, the plaintiff received primary LEO credit for his services from February 28, 1989 through July 15, 1993. He subsequently filed a request for primary LEO credit for his services from July 15, 1993 through July 13, 1994. The United States Court of Appeals for the Federal Circuit in *Bingaman v. Department of Treasury* affirmed the MSPB's decision upholding the agency's denial of Bingaman's claim for primary LEO credit, even though the plaintiff had previously received primary LEO credit for services performed as a Customs Service employee during an earlier time period. *Id.* at 1436–38. The *Bingaman* court held that the previous grant of LEO credit to the plaintiff did not serve to bar the consideration of primary credit during a subsequent time period. *Id.* at 1436–38. In holding that collateral estoppel did not apply, the *Bingaman* court relied on an exception to the collateral estoppel principle which arises when "there has been a change in the applicable law between the time of the original decision and

the subsequent litigation in which collateral estoppel is invoked." *Id.* at 1437. Referring to changes in MSPB case law, the *Bingaman* court wrote that "there has been a sufficient change in the 'legal atmosphere' with respect to the issue of LEO retirement credit that the bar of collateral estoppel should not be applied in this case." *Id.* at 1438.

■ "The doctrine of collateral estoppel, or issue preclusion, serves to bar the revisiting of issues that have already been litigated by the same parties or their privies based on the same cause of action." *Banner v. United States,* 238 F.3d 1348, 1354 (Fed.Cir.2001). Collateral estoppel "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (citing *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). "Collateral estoppel requires four factors: (1) the issues are identical to those in a prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Banner v. United States,* 238 F.3d at 1354 (citing *Jet. Inc. v. Sewage Aeration Sys.,* 223 F.3d 1360, 1365–66 (Fed.Cir.2000)).

■ Previously determined agency decisions may be given preclusive effect in subsequent lawsuits brought in federal courts. *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." *Id.* (citing *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940)). The United States Supreme Court also endorsed giving collateral estoppel effect to administrative factfinding in *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). The Court stated:

Thus, *Utah Construction,* which we subsequently approved in *Kremer v. Chemical Construction Co[rp].,* 456 U.S. [461], 484–485, n. 26, 102 S.Ct. [1883], 1899, n. 26[, 72 L.Ed.2d 262 (1982)], teaches that giving preclusive effect to administrative factfinding serves the value underlying general principles of collateral estoppel: enforcing repose. This value, which encompasses both the parties' interest in avoiding the cost and vexation of repetitive litigation and the public's interest in conserving judicial resources, *Allen v. McCurry,* 449 U.S., at 94, 101 S.Ct., at 414, is equally implicated whether factfinding is done by a federal or state agency.

*Id.* at 798, 106 S.Ct. 3220; *see also Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). "An issue on which relitigation is foreclosed may be one of evidentiary fact, of 'ultimate fact' (i.e., the application of law to fact), or of law." Restatement (Second) of Judgments, § 27 cmt. c (1982).

■ In determining whether an agency has acted in a judicial capacity, the United States Court of Appeals for the Seventh Circuit has offered useful guidance to identify the safeguards which indicate the requisite judicial capacity: "(1) representation by counsel, (2) pretrial discovery, (3) the opportunity to present memoranda of law, (4) examinations and cross-examinations at the hearing, (5) the opportunity to introduce exhibits, (6) the chance to object to evidence at the hearing, and (7) final findings of fact and conclusions of law." *Reed v. AMAX Coal Co.,* 971 F.2d 1295, 1300 (7th Cir.1992) (per curiam). Other courts have held that an agency decision will not be given collateral estoppel effect if the agency proceeding lacked certain characteristics utilized in court proceedings. *See also Delamater v. Schweiker,* 721 F.2d 50, 53–54 (2d Cir.1983) (finding that "[a]n action taken by an administrative agency to grant or deny a benefit is not an adjudicated action unless the agency has made its decision using procedures substantially similar to those employed by the courts" and that an administrative decision in which "[t]here was no hearing, no testimony, no subpoenaed evidence, no argument, no

opportunity to test any contention by confrontation" would not be given preclusive effect); *Howard v. United States,* 497 F.2d 1270, 1272 (7th Cir.1974) (finding that the Internal Revenue Service's (IRS) determination which failed to result in a disallowance of the plaintiffs' claimed theft loss was not "judicial in nature but administrative" and did not preclude the IRS from reconsidering the taxpayer's liability). In *Nasem v. Brown,* 595 F.2d 801 (D.C.Cir.1979), the United States Court of Appeals for the District of Columbia Circuit considered whether to give collateral estoppel effect to an agency decision regarding a reprisal claim. The complainant had filed a written charge containing all facts pertinent to the alleged reprisal within fifteen days of the alleged occurrence and within fifteen days thereafter, the employer agency had investigated the charge and filed its response with the agency pursuant to 5 C.F.R. § 713.262(b)(1). *Id.* at 806–07. Based on the procedures established at the administrative level, particularly the inability of the parties to present live witness testimony in a case which turned on retaliatory motivation, the *Nasem* court found that the administrative decision did not collaterally estop the District Court from reconsidering the plaintiff's reprisal claim because the procedures involved did "not provide procedural safeguards contemplated by *Utah Construction." Id.* at 807.

■ The OPM, a federal executive branch agency, credited Mr. Buckley with primary LEO retirement coverage under 5 U.S.C. §§ 8331(20) and 8336(c) from January 1, 1975 until October 20, 1979, and secondary LEO retirement coverage from October 21, 1979 until August 23, 1989. Plaintiff currently seeks secondary administrative credit from August 24, 1989 to the present.

In Mr. Buckley's case, the procedures followed by OPM in granting primary and secondary credit to the plaintiff from 1975 until 1989 do not demonstrate that OPM acted in a judicial capacity. Under the C.F.R. sections in effect at the time that Mr. Buckley was granted LEO credit, an employee could submit an individual request to the employing agency for a determination of whether the employee's position qualified as a primary or secondary position. *See* 5 C.F.R. § 831.905(b)(1)(ii) (1984); 5 C.F.R. § 831.908(b) (1992). Once the employee submitted his or her application, a DEA official would review the employee's application and submit an advisory opinion to OPM. *See* 5 C.F.R. § 831.908(b) (1992). After reviewing the employee's application, including any documentary evidence and DEA's recommendation, OPM would issue a final determination based on the papers. 5 C.F.R. § 831.909. The plaintiff does not claim that either the employee or the DEA ever had the opportunity to conduct pretrial discovery, present memoranda of law, conduct examinations or cross-examinations of witnesses, introduce exhibits, or object to any evidence presented. In fact, the procedures employed at the administrative level to determine whether Mr. Buckley qualified for LEO credit from 1975 until 1989 are similar to the procedures followed in *Nasem v. Brown,* which the *Nasem* court found inadequate to show that the agency had acted in a judicial capacity. 595 F.2d at 807. Because the procedures employed at the administrative level did not contain judicial-type procedures, which ensure that the issues presented are fully explored or litigated, the court finds that OPM did not act in a judicial capacity and no judicial-like proceeding was held regarding Mr. Buckley's claims. Neither OPM's decision granting Mr. Buckley primary and secondary credit from 1975 until 1989, nor MSPB's dismissal of Mr. Buckley's appeal to the MSPB without prejudice, and prior to any proceeding on the merits, preclude the court from reconsidering whether Mr. Buckley occupied a primary position when he served as a DI from 1975 to 1979 and whether he occupied secondary positions from 1979 until 1989.

In the present case, as part of the court's consideration of the plaintiff's entitlement to secondary credit, the court must consider whether the plaintiff occupied a primary position for the purposes of the transfer requirement of 5 C.F.R. § 831.904 (2001). Thus, a change in the legal atmosphere regarding determinations of primary credit could effect a change regarding determinations of secondary credit. In *Bingaman,* the United States Court of Appeals for the Fed-

eral Circuit noted the significant change of standards at the MSPB and utilized in decisions issued by that Board regarding LEO credit. 127 F.3d at 1437. The MSPB decisions, however, do not serve as binding precedent for this court, although, of course, the decisions issued by the United States Court of Appeals for the Federal Circuit do bind this court. The MSPB decisions reviewed by the Federal Circuit were significantly fact bound and the appellate review by the Federal Circuit was focused on whether each of the decisions issued by the MSPB was arbitrary, capricious or not in accordance with the law. In each of the key Federal Circuit cases reported, the appellate court held that the MSPB's finding respecting eligibility for LEO credit was not arbitrary, capricious or otherwise not in accordance with law. In other words, in each of those cases, based on the factual record, the plaintiff failed to meet the burden to establish reversible error by the Board. *See. e.g., Hall v. Dep't of the Treasury,* 264 F.3d at 1054.

Moreover, with respect to determining eligibility for LEO credit, direction from the Federal Circuit on how to follow their guidance remains somewhat undefined. The key cases decided by the court in which opinions were issued appear to establish exemplary, non-binding guidelines from which the finder of fact can choose, depending on the individual facts of the case, to assist the statutory definition when determining eligibility for LEO credit. The Federal Circuit decisions do not dictate that the factors considered in *Bingaman, Hannon, Watson* or *Hall* must be applied to every case considering an employee's eligibility for LEO credit, including eligibility in different work assignments or those arising in this court, as opposed to at the MSPB. In *Hall v. Department of the Treasury,* the court wrote:

> [a]s we stated in *Hannon,* the evaluation of and weight to be given to the various *Bingaman* considerations and the other evidence in the record are judgment calls that rest primarily within the direction of the Board.... [I]t is not our function to substitute our judgment for that of the agency [finder of fact] regarding the weight to be given to those considerations.

264 F.3d at 1060 (citing *Hannon v. Dep't of Justice,* 234 F.3d at 681). In *Watson v. Department of the Navy,* 262 F.3d 1292, the court explicitly held that "[t]his court, however, has never adopted the *Bingaman* factors; nor has the court held that federal employees are always entitled to LEO coverage so long as they satisfy the *Bingaman* factors." *Watson v. Dep't of Navy,* 262 F.3d at 1301. In addition, the *Watson* court, when listing factors it considered in deciding the *Watson* case, stated that the five factors it was setting forth were the "most probative factors," but not required factors to be considered in every case involving LEO credit. *Id.* at 1302. In *Hall v. Department of the Treasury,* the court wrote, "[n]o single factor is essential or dispositive." 264 F.3d at 1056–57. As is discussed more fully below in an in depth discussion of the governing statute, regulations and the *Hobbs, Bingaman, Hannon, Watson,* and *Hall* cases, this court does not believe that the applicable governing law for this court has significantly changed from the statutory definition. Thus, the exception to collateral estoppel principles invoked by the defendant would not prevent the application of collateral estoppel, if it was otherwise appropriate.

Furthermore, with respect to the application of collateral estoppel regarding whether Mr. Buckley occupied a primary position, the record does not contain any facts or instrument or transaction of a form separable from the previous determinations of Mr. Buckley's entitlement to primary credit. In *Bingaman,* the facts considered in the later proceeding were clearly separable because the employee sought an award of primary credit for a different time period. *Bingaman v. Dep't of Treasury,* 127 F.3d at 1434. Although the employee's job description and duties may have been materially identical, Bingaman's duties for the period July 15, 1993 through July 13, 1994 were clearly separable from Bingaman's duties for the period from February 28, 1989 through July 15, 1993. Likewise, in *Commissioner v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898, the royalties paid pursuant to the 1928 license contract were separable from the royalties paid pursuant to later license contracts. 333 U.S. at 602, 68 S.Ct. 715. Additionally,

in *Sunnen*, the royalties paid pursuant to the 1928 contract that were distributed from 1929 to 1931 were separable from the royalties paid pursuant to the same contract but distributed in 1937. *See id.* at 595–96, 68 S.Ct. 715.

In the present case, however, the facts considered by this court are not separable from the facts considered by the OPM in 1984 when it granted Mr. Buckley primary credit. If this court were to consider Mr. Buckley's eligibility for primary credit, it would consider the very same facts considered by OPM in its determination regarding Mr. Buckley's primary credit—namely, Mr. Buckley's job description and responsibilities from January 1, 1975 to October 20, 1979. None of the facts relevant to Mr. Buckley's entitlement to primary credit have changed, and if collateral estoppel were otherwise appropriate, this court would not reconsider a final decision made on identical facts that are not separable in any way, shape, or form. In Mr. Buckley's case, however, there has been no action by an administrative agency acting in a judicial capacity to resolve issues of fact properly before it in a situation in which the parties have had an adequate opportunity to litigate. *See United States v. Utah Constr. and Mining Co.*, 384 U.S. at 422, 86 S.Ct. 1545. Thus, collateral estoppel is inappropriate.

## IV. PLAINTIFF BUCKLEY'S CLAIMS

As discussed above, the rules of statutory construction are equally applicable to the interpretation of administrative regulations. These rules of statutory construction, therefore, will be used to interpret the relevant statute and the regulations in the present case. The court's analysis begins with the plain language of the statute. *Duncan v. Walker*, 533 U.S. 167, 121 S.Ct. 2120, 2124, 150 L.Ed.2d 251 (2001); *Carter v. United States*, 530 U.S. 255, 257, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *Duncan v. Walker*, 121 S.Ct. at 2125; *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *Duncan v. Walker*, 121 S.Ct. at 2125 (noting that court's should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence ... It is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (quoting *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)); *Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (2000).

A court must not stray from the statutory definition of a term. *See Stenberg v. Carhart*, 530 U.S. 914, 942, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Meese v. Keene*, 481 U.S. 465, 484–485, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Colautti v. Franklin*, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). "It is axiomatic that the statutory definition of the term excludes unstated meanings of that term." *Meese v. Keene*, 481 U.S. at 484–85, 107 S.Ct. 1862. As the United States Court of Appeals for the Federal Circuit stated in *AK Steel Corp. v. United States:*

> When Congress makes such a clear statement as to how categories are to be defined and distinguished, neither the agency nor the courts are permitted to substitute their own definition for that of Congress, regardless of how close the substitute definition may come to achieving the same result as the statutory definition, or perhaps a result that is arguably better.

226 F.3d 1361, 1372 (Fed.Cir.2000). When a word is undefined, court's regularly give that term its ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995); *AK Steel Corp. v. United States*, 226 F.3d at 1371.

A singular term may not be read in isolation, however. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 121 S.Ct.

1946, 1951, 150 L.Ed.2d 62 (2001) (citing *Gade v. Nat'l Solid Wastes Mgmt. Assn.,* 505 U.S. 88, 99, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). The "meaning of a provision is 'clarified by the remainder of the statutory scheme ....'" *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 121 S.Ct. 1433, 1443, 149 L.Ed.2d 401 (2001) (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) and describing statutory construction as a "holistic endeavor"). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. Saint Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941) (L.Hand, J.)).

 When the statute provides a clear answer, the court's analysis is at an end. *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 254, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (quoting *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)). Thus, when the "'statute's language is plain, "the sole function of the courts is to enforce it according to its terms."'" *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enterps., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such an instance, the court will not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d 388, 391 (Fed.Cir.1994) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that court must not defer to agency interpretation contrary to intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has

true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391. (citing *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). "'[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" *Shannon v. United States,* 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *Circuit City Stores. Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 1311, 149 L.Ed.2d 234 (2001) (citing *Ratzlaf v. United States,* 510 U.S. 135, 147–148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.")).

There are select instances when resort to legislative history is proper. For example, a court may consider legislative history if:

the plain meaning produces a result that is not just "harsh," *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 576, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982), "curious," *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 172, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978), or even "stark and troubling," *Estate of Cowart,* 505 U.S. at [483], 112 S.Ct. at 25[8]9, but "so bizarre that Congress 'could not have intended' it," *Demarest v. Manspeaker,* 498 U.S. 184, 186, 190–91, 111 S.Ct. 599, 601–02, 603–04, 112 L.Ed.2d 608 (1991).

*Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391. Moreover, legislative history may be introduced into the analysis to resolve an ambiguous statute. *Ratzlaf v. United States,* 510 U.S. at 148 n. 18, 114 S.Ct. 655 (citing *Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)); *Patterson v. Shumate,* 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

 "If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating." *Gustafson v. Alloyd Co.,* 513

U.S. 561, 580, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)). "'[T]he fears and doubts of the opposition are no authoritative guide to the construction of legislation'" because of the likelihood that those in opposition tend to overstate the reach of the bill in question. *Bryan v. United States*, 524 U.S. 184, 196, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394, 71 S.Ct. 745, 95 L.Ed. 1035 (1951)). Moreover, statements by individual legislators should not be given controlling weight, although such statements may evidence congressional intent when consistent with statutory language and other pieces of legislative history. *Brock v. Pierce County*, 476 U.S. 253, 263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (citing *Grove City Coll. v. Bell*, 465 U.S. 555, 567, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)).

■■■ "[S]ubsequent history is less illuminating than the contemporaneous evidence.'" *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 170, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (quoting *Hagen v. Utah*, 510 U.S. 399, 420, 114 S.Ct. 958, 127 L.Ed.2d 252, *reh'g denied* (1994); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77, n. 6, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994)) ("[T]he views of one Congress as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight ... and the views of the committee of one House of another Congress are of even less weight."). *But cf. Loving v. United States*, 517 U.S. 748, 770, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ("'"Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."'") (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (quoting *Red Lion Broad.*

*Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969))). In this regard, a court should give little weight to attempts to infer Congressional intent to adopt judicial interpretations of a statutory provision when Congress revises the statutory scheme but fails to amend the provision in question. *See Alexander v. Sandoval*, 531 U.S. 1049, 121 S.Ct. 652, 148 L.Ed.2d 556 (2000). Similarly, "'failed legislative proposals are "a particularly dangerous ground on which to rest an interpretation of a prior statute."'" *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. at 170, 121 S.Ct. 675 (quoting *Cent. Bank of Denver. N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (quoting *Pension Benefit Guar., Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579, (1990))).

■■■ Thus, in the instant case, when determining entitlement to LEO credit, the court begins with the plain language of the statute and the regulations. Mr. Buckley claims that he is entitled to LEO credit in the secondary administrative category for the two positions he held from August 24, 1989 to the present. To prove his eligibility for a special rate of pay under FLEPRA section 403, 5 U.S.C. § 5305 note (2000), a special pay adjustment under FLEPRA section 404, 5 U.S.C. § 5305 note, and premium pay pursuant to FLEPRA section 410, 5 U.S.C. §§ 5542, see also § 5547, the plaintiff must meet a threshold requirement of demonstrating that he has LEO status.

As defined by the applicable statute, a "law enforcement officer" means "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position." 5 U.S.C. § 8331(20) (2000). The regulations governing determinations of LEO credit reiterate the definition set forth in 5 U.S.C. § 8331(20) and supplement the statutory definition by providing: "The definition does not include

an employee whose primary duties involve maintaining law and order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than persons who are suspected or convicted of offenses against the criminal laws of the United States." 5 C.F.R. § 831.902 (2001).[13]

The regulations also define "primary duties" as those duties which: (1) "Are paramount in influence or weight; that is, constitute the basic reasons for the existence of the position;" (2) "[o]ccupy a substantial portion of the individual's working time over a typical work cycle;" and (3) "[a]re assigned on a regular and recurring basis." 5 C.F.R. § 831.902 (2001). Moreover, "[d]uties that are of an emergency, incidental, or temporary nature cannot be considered 'primary' even if they meet the substantial portion of time criterion." *Id.* The versions of the C.F.R. issued from 1991 until the present also provide the following additional guidance: "in general, if an employee spends an average of at least 50 percent of his or her time performing a duty or group of duties, they are his or her primary duties." *See, e.g.,* 5 C.F.R. § 831.902 (2001). The fifty percent standard set forth after 1991 is consistent with the rest of the regulation, and the court finds that this standard is helpful for determining whether the duties required by the statute were Mr. Buckley's primary duties, even regarding the application Mr. Buckley submitted in 1990.

A secondary position is defined as a position that:

(1) is clearly in the law enforcement or firefighting field;

(2) is in an organization having a law enforcement or firefighting mission; and

(3) is either—

(i) Supervisory; i.e., a position whose primary duties are as a first-level supervisor of law enforcement officers or firefighters in primary positions; or

(ii) Administrative; i.e., an executive, managerial, technical, semiprofessional, or professional position for which experience in a primary law enforcement or firefighting position, or equivalent experience outside the Federal government, is a prerequisite.

5 C.F.R. § 831.902.

In addition to proving that he occupies a secondary position, the plaintiff must also meet the following criteria: (1) the employee is transferred directly (i.e., without a break in service exceeding three days) from a primary position to a secondary position; and (2) if applicable, the employee has been continuously employed in secondary positions since transferring from a primary position without a break in service exceeding three days. 5 C.F.R. § 831.904(a)(1)-(2). As noted above, to meet the transfer requirement, the plaintiff must show that he occupied a primary position. A "primary position" means a position whose primary duties are: "Investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." 5 C.F.R. § 831.902.

"An employee who requests credit for service under 5 U.S.C. § 8336(c) bears the burden of proof with respect to that service ...." 5 C.F.R. § 831.906(a) (2001).[14] In addition, beginning in 1990, coverage "in a position or credit for past service will not be granted for a period greater than 1 year prior to the date that the request from an individual is received ... by the employing agency, the agency where past service was performed, or OPM." 5 C.F.R. § 831.906(e) (2001).[15]

## A. Break In Service

For entitlement to LEO credit, Mr. Buckley must show that there were no voluntary

---

**13.** This regulation was promulgated on December 17, 1987. *See* Subpart I—Law Enforcement Officers and Firefighters, 52 Fed.Reg. 47,894 (Dec. 17, 1987) (codified at 5 C.F.R. § 831.902).

**14.** Prior to 1994, this quote was contained in 5 C.F.R. § 831.908(a). *See, e.g.,* 5 C.F.R. 831.908(a) (1993).

**15.** From 1990 to 1993, this regulation appeared at 5 C.F.R. § 831.908(e). *See, e.g.,* 5 C.F.R. § 831.908(e) (1993).

breaks in service exceeding three days between any of the transfers Mr. Buckley made, including from his primary position to his secondary position and between his various secondary positions. Mr. Buckley testified that there were no breaks in his service throughout his DEA career between any of the various positions he has held within DEA since 1975. No contrary evidence has been presented to the court. Therefore, the court finds that Mr. Buckley was continuously employed in a position within DEA from 1975 until the present.

## B. Primary Position

To meet the transfer requirement for secondary credit, the plaintiff must prove that he occupied a primary position and that he transferred directly from that primary position into a secondary position. 5 C.F.R. § 831.904(a) (2001). To show that he occupied a primary position, the plaintiff must show that his primary duties meet the definition of law enforcement officer, namely the "[i]nvestigation, apprehension, *or* detention of individuals suspected or convicted of offenses against the criminal laws of the United States." 5 C.F.R. § 831.902 (emphasis added). This definition is identical to the definition established in 5 U.S.C. § 8331(20) (2000), which sets forth the definition of a "law enforcement officer." Notably, both the applicable statute and regulations use the disjunctive "or" in the language chosen. In *Felzien v. OPM*, 930 F.2d 898 (Fed.Cir.1991), the United States Court of Appeals for the Federal Circuit discussed the use of the word "or" in 5 U.S.C. § 8331(21) (1988), as it related to the standard for entitlement to preferential credit for a firefighter. The *Felzien* court stated:

> Notwithstanding OPM's assertion to the contrary, "or" *means* "or": an employee can qualify either by controlling and extinguishing fires *or* by maintaining and using firefighting apparatus and equipment. The House Report does imply that employees must be exposed to some hazard to qualify even under the maintenance and use clause, but that does not collapse the two clauses into one.

*Id.* at 902. Similarly, in interpreting the definition of "law enforcement officer" pursuant to 5 U.S.C. § 8331(20) (2000), "or" means "or." An employee qualifies for LEO credit if his or her primary duties are the "investigation, apprehension, *or* detention of individuals suspected *or* convicted of offenses against the criminal laws of the United States." 5 U.S.C. § 8331(20) (emphasis added). Upon review of the language of the applicable statute and regulations, the court finds that the plain meaning of the language used is clear. Thus, the court should not look to the legislative history to interpret or modify the standard articulated in the words of the statute for determining eligibility as an LEO in a primary position, since the meaning of the words is clear in the statute and regulation.

The words and the sentence structure of the statute and regulation defining "law enforcement officer" are uncomplicated and have remained unchanged since 1990. Moreover, Congress set forth a specific definition of "law enforcement officer." In doing so, Congress intended to exclude all other unstated meanings. *See Meese v. Keene*, 481 U.S. at 484–85, 107 S.Ct. 1862.

To be considered "primary duties," the investigative duties of an LEO must meet three prongs. Primary duties are those that: (1) are paramount in influence or weight; that is, constitute the basic reasons for the existence of the position; (2) occupy a substantial portion of the individual's working time over a typical work cycle; and (3) are assigned on a regular and recurring basis. 5 C.F.R. § 831.902 (2001). The general guideline under the regulation provides that "[i]n general, if an employee spends an average of at least 50 percent of his or her time performing a duty or group of duties, they are his primary duties." *Id.*

According to a DEA study of the Diversion Control Program conducted from May 1982 until April 1983, the DI position was originally created to "ensure [ ] compliance with the regulatory aspects of the Controlled Substance Act." The regulatory aspects of the DI position center on conducting cyclic (regulatory) investigations, which are "unannounced in-depth audits of controlled substances ac-

tivity, focusing on production and inventory levels and purchase, transfer, and sales records. Other key activities include the review of internal accounting practices, inventory procedures, security systems, registration information, and existing systems that monitor their customer's purchases/actions." The court is concerned, however, not with the reasons why the position was created, but with why this position existed at the time of application for LEO credit. *See Watson v. Dep't of the Navy*, 262 F.3d at 1300. In this regard, the DEA study explained the evolution of the DI program as follows:

> Prior to 1979, the Office of Compliance and Regulatory Affairs devoted most of its investigative resources towards ensuring compliance with the regulatory aspects of the Controlled Substance Act. As DEA redirected its resources from wholesaler/manufacturer compliance to retail diversion, a larger portion of its resources were spent on criminal investigations. Currently, while regulatory investigations at the non-practitioner level still remain an intricate part of the diversion effort, criminal retail diversion has emerged as the area of major concern.

The shift toward criminal investigations occurred partly because "[b]y 1977, the Office of Diversion Control concluded that the cyclic investigation program had effectively reduced diversion at the non-practitioner level and that a shift to practitioner level was necessary to attack the growing retail diversion problem." The DEA study, although critical of the criminal investigation role of DIs (GS 1810's) as opposed to DEA Special Agents (GS 1811's), found that DIs were doing criminal investigatory work even to the point of finding that the two groups were in "competition in the dangerous drugs area." The report also noted that: "In effect DEA has created and is perpetrating a two tier enforcement program. One enforcement effort against practitioner diversion and one enforcement effort against all other drugs. The 1810 core group has in effect become defacto 1811s." The DEA report also noted that "the increased danger to 1810 personnel" as well as "the evolution of a sec[o]nd and separate enforcement effort ...." and

that "Field OD [Office of Diversion] personnel are directed to work criminal cases."

At trial, Mr. Buckley testified that he began performing criminal investigations at the end of 1974 or early 1975. Margaret Brophy, who was a DI during the same time period as Mr. Buckley, also indicated that "[s]tarting late '75 and clearly from '76, 1976 on, my primary duties were investigating criminal diversion case[s]." Sean Mahoney, who also worked as a DI when Mr. Buckley was a DI, similarly stated that his job duties changed in 1978. Regarding this change in duties, Mr. Mahoney stated:

> There was a swing, a movement from when I started to come over and which when I first came over from the agent job to the diversion job. Maybe ninety percent was regulatory. Then moving up into the 1970s there was a gradual increase and maybe sometimes not so gradual into ninety to one hundred percent of our work was considered to be criminal investigation.

Thus, although the DI position originally may have been created primarily to perform cyclic documentary reviews, the basic reasons for the existence of the position began to shift in the mid–1970's and by 1983, DEA policy "reflect[ed] an agency belief that the most effective way to impact diversion [was] through criminal investigations ...." and in fact, many DIs became primarily criminal investigators. As is developed more fully below, there is nothing in the record to suggest that the DEA took deliberate action to direct diversion investigators away from criminal investigative work. Although the agency, in the Miller and Muller Memoranda, discussed more fully later in the opinion, announced restrictions on Diversion Investigators regarding certain specific activities, such as undercover work, surveillance, directing or paying informants and execution of search warrants, a DI's primary duties still involved the investigation of individuals suspected of offenses against the criminal laws of the United States. *See* 5 U.S.C. § 8331(20) (2000); 5 C.F.R. § 831.902 (2001). Moreover, no evidence to the contrary was introduced to establish that the DEA altered the criminal investigative nature of a DI's primary duties.

Furthermore, Mr. Buckley testified that from 1975 until 1979, as a DI, he spent "at least seventy-five percent" of his time on criminal investigations. Edward Guillen, a Special Agent working on criminal diversion cases, and not on regulatory diversion work, testified that when he worked with Mr. Buckley in the same group, a majority of Mr. Guillen's time was spent on registrant investigations. Special Agent Guillen estimated that "certainly" more than half of his time was spent working on diversion cases. In addition, when Mr. Guillen worked on criminal diversion cases, he worked "with many of the Diversion investigators, but primarily with Mr. Buckley." As also addressed below, in the court's discussion of Mr. Buckley's actual duties in his primary position, Mr. Buckley spent a substantial amount of time performing the duties required to conduct criminal investigations. The evidence shows that he had frequent direct contact with criminals and criminal suspects when he interviewed witnesses and developed informants. The plaintiff also participated in searches, conducted surveillance and gathered evidence. The evidence related to Mr. Buckley's actual duties support his assertion that he spent over fifty percent of his time as a DI conducting criminal investigations. Furthermore, the defendant did not attempt to prove and did not offer evidence that Mr. Buckley did not spend more than fifty percent of his time performing criminal investigative duties. Thus, the record supports the plaintiff that from 1975 until 1979, while Mr. Buckley was a DI, he was assigned to and spent over fifty percent of his time as a DI working on criminal investigations.[16] In performing this criminal work, Mr. Buckley investigated criminals or suspected criminals for violating the criminal laws of the United States by diverting drugs into illegal channels. Because criminal investigations constituted the basic reasons for the existence of Mr. Buckley's assigned DI position from 1975 to 1979, and because Mr. Buckley spent over fifty percent of his time during those years investigating individuals suspected or convicted of offenses against the United States, based on the plain language of 5 U.S.C. § 8331(20) (2000), the court finds that Mr. Buckley's duties consisted primarily of investigating individuals suspected or convicted of offenses against the criminal laws of the United States. Thus, Mr. Buckley occupied a primary position when he served as a DI from 1975 until 1979.

As discussed above, this court finds that the plain meaning of the applicable statute is clear and that the court should not look beyond the statute to analyze the plaintiff's claims. Moreover, even the MSPB tacitly acknowledged that it was looking to the legislative history instead of applying the plain meaning of the statute. In *Hobbs v. OPM*, 58 M.S.P.R. 628, 632 (1993), the MSPB stated that "[a] literal reading of 5 U.S.C. § 8331(20) would appear to afford the appellant LEO retirement credit for his service as a Special Inspector because his duties in that position were " 'primarily the investigation ... of individuals suspected ... of offenses against the criminal laws of the United States.' " *Id.* (footnote omitted). The Board, however, stated: "We find, however, that such a literal reading [of 5 U.S.C. § 8331(20) ] would be contrary to the clearly expressed legislative intent." Despite its statement that a literal reading would produce a clear result, suggesting that no resort to legislative history was appropriate, the Board in *Hobbs* stated, "the term 'investigation' under 5 U.S.C. § 8331(20) should be construed as 'criminal investigation,' " regardless of the fact that the word "criminal" does not appear in the statutory definition. *Id.* at 633. Based on its own definition of the term "investigation," constructed, as it stated "in light of the legislative intent," the Board considered factors to determine eligibility for LEO credit, which, in its view, indicated work in criminal investigations, including "unusual physical hazards for the investigator, deriving from frequent contacts with criminals and suspected criminals," "physical stamina and vigor," and requirements that the investigator "work for long stretches of

---

**16.** Moreover, a government study of the Diversion Program issued in 1990 also concludes that as late as 1990, "[d]espite the differences between the [1810 and the 1811] series, ..., 1810 Diversion Investigators are conducting diversion criminal investigations (for up to 60 percent of their time) which technically satisf[ies] OPM's definition for eligibility under 6(c)."

time without a break, be on call 24 hours a day, and/or carry weapons." *Id.* The Board in *Hobbs,* therefore, relied on other than the normal rules of statutory construction, and, as the Board stated, "the plain language of a statute should control absent a clearly expressed legislative intent to the contrary." *Id.* at 632 (citing *Miller v. Dep't of Army,* 987 F.2d 1552, 1555 (Fed.Cir.1993)). *But see Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391 (noting that plain meaning may be discarded only when the result is "so bizarre that Congress 'could not have intended' it.").

The relevant portion of the legislative history, on which the *Hobbs* court relied, was a statement made in a Senate report:

> The history of retirement legislation dealing with law-enforcement officers and firefighters shows Congressional intent to liberalize retirement provisions so as to make it feasible for these employees to retire at age 50. This intent has been based on the nature of the work involved and the determination that these occupations should be composed, insofar as possible, of young men and women physically capable of meeting the vigorous demands of occupations which are far more taxing physically than most in the Federal Service. They are occupations calling for the strength and stamina of the young rather than the middle aged. Older employees in these occupations should be encouraged to retire.

S.Rep. No. 93–948, *reprinted in* 1974 U.S.C.C.A.N. 3698, 3699. This statement in the Senate report does not contradict the standard set forth in the statute. The legislative history does not establish the criteria for LEO status, but merely articulates a Congressional goal to develop a more youthful workforce for certain federal occupations. The goal of determining which occupations should be composed of a youthful workforce was considered by the Congress which, nonetheless, ultimately passed a plain English definition of LEO, which does not include such a statutory goal. Given the clear, unambiguous language of the statute, the legislative history is interesting, but should not be used to alter the plain meaning of the words

Congress chose to employ. The statutory language, when applied to Mr. Buckley's case, although not welcomed by the agency, does not produce a result that is so bizarre that Congress could not have intended it.

Subsequent to the issuance of *Hobbs,* the MSPB decided a string of additional cases involving LEO eligibility, basing their determinations on the factors set forth in *Hobbs. See, e.g., Taylor v. Dep't of Treasury,* 68 M.S.P.R. at 696; *Peek v. OPM,* 63 M.S.P.R. at 432; *Sauser v. OPM,* 59 M.S.P.R. at 492.

Then, in *Bingaman v. Department of the Treasury,* 127 F.3d 1431, the United States Court of Appeals for the Federal Circuit affirmed an MSPB decision regarding Customs Service Detention Systems Specialists or their supervisors, which considered the factors first enunciated in the *Hobbs* decision. Without directly addressing whether or not the statutory and regulatory language of 5 U.S.C. § 8331(20) and 5 C.F.R. § 8331.902 are clear on their face, the *Bingaman* court stated that "the statutory term 'law enforcement officer' has not been given expansive application. The court also stated that the definition of law enforcement officer in section 8331(20) has been 'strictly construed.'" *Id.* at 1435 (citing *Ryan v. MSPB,* 779 F.2d 669, 672 (Fed.Cir.1985)). Nonetheless, because, according to the court, the statute provided only general guidance, the court went on to expand the statutory definition by approving, as not arbitrary, capricious or not in accordance with the law, the Board's decision to resort to the legislative history to support the MSPB's development of factors to be used to determine LEO eligibility. The court in *Bingaman* was careful to illustrate, however, that no single factor was "essential or dispositive." *Id.* at 1436.

In *Hannon v. Department of Justice,* 234 F.3d 674, the Federal Circuit similarly affirmed a decision of the MSPB denying LEO retirement credit to a DI (who is also a plaintiff in the above consolidated cases). The *Hannon* court followed the *Bingaman* case and applied the factors enunciated in that case, also without discussing the statutory construction, except to similarly state "we strictly construe the definition of law enforcement officer." *Id.* at 677 (citing *Bingaman*

*v. Dep't of the Treasury,* 127 F.3d at 1435). The MSPB decision in *Hannon* also was reviewed using the arbitrary or capricious standard. *Id.* at 681–82.

More recently, in *Watson v. Department of the Navy,* 262 F.3d 1292, the United States Court of Appeals for the Federal Circuit elaborated on the language it had used in *Bingaman,* stating that in considering eligibility for LEO coverage, "[t]he six *Bingaman* factors may . . . be considered as necessary and appropriate," but that "[t]his court . . . has never adopted the *Bingaman* factors; nor has the court held that federal employees are always entitled to LEO coverage so long as they satisfy the *Bingaman* factors." *Id.* at 1301, 1303. The *Watson* court noted that some of the most probative factors are not even a part of the *Bingaman* test. *Id.* at 1302. Thus, the *Watson* court established five factors, separate from the *Bingaman* factors, which it found to be the "most probative." The *Watson* court stated:

> In order to determine that an officer is entitled to LEO retirement credit, the officer must show that the *primary* duties of his or her position, as defined by 5 C.F.R. §§ 831.902, 842.802 [(1994)], are the investigation, apprehension, and [17] detention of criminals or suspects. The most probative factors, we hold, are: 1) whether the officers are merely guarding life and property or whether the officers are instead more frequently pursuing or detaining criminals; 2) whether there is an early mandatory retirement age; 3) whether there is a youthful maximum entry age; 4) whether the job is physically demanding so as to require a youthful workforce; and 5) whether the officer is exposed to hazard or danger.

*Id.* at 1303 (emphasis in original). Although the *Watson* court reiterated the statutory language and, thus, the standard established by the plain language of 5 U.S.C. § 8331(20) (1994) and 5 C.F.R. § 831.902, the court relied on legislative intent. Based on the legislative history, the *Watson* court established a new list of factors it determined to be the "most probative." The *Watson* court, however, also did not mandate that these factors must be used in examining eligibility for LEO credit in every case or that an employee must meet all the listed factors for entitlement to LEO credit.

An even more recent Federal Circuit case is *Hall v. Department of the Treasury,* 264 F.3d 1050. Like the court in *Watson,* the court in *Hall v. Department of the Treasury* warned of over reliance on any particular set of factors. After reviewing the statute, but without specifically analyzing the plain meaning words of 5 U.S.C. § 8331, and after reviewing the legislative history of the statute, the *Hall* court found that the *Bingaman* factors did not run counter to or replace, but rather reflected, the statutory language. *Id.* at 1056. The *Hall* court characterized the *Bingaman* factors as a "set of tools" which was used by the MSPB to gauge whether the facts of a particular case fall within the definition of the statute. *Id.* The court warned, however, that "the list of considerations set forth in *Bingaman* is by no means an exhaustive or exclusive list of the considerations that bear on whether an employee qualifies for LEO service credit under the statute." *Id.* at 1057. Finally, the court noted that while certain factors could be used by a court in determining LEO status, 5 U.S.C. § 8331 "serves as the ultimate measure of LEO credit activity." *Id.* at 1056.

As described by the Federal Circuit, the factors used by the MSPB and found reasonable by the Federal Circuit are useful to determine eligibility for LEO credit. In affirming the decisions of the MSPB, however, by finding that the Board's fact bound decisions were not arbitrary, capricious, or otherwise not in accordance with the law, the various decisions of the Federal Circuit have been careful to point out that the factors enunciated are not requirements, but only establish a framework which may be utilized.

---

17. Although the *Watson* court used the word "and" in describing the standard for LEO eligibility, 5 U.S.C. § 8331(20) (1994) and 5 C.F.R. § 831.902 (1994), the versions of the statute and regulation the court was interpreting, state that a law enforcement officer position involves primarily the "[i]nvestigation, apprehension, *or* detention" of criminals or suspected criminals. The 1994 version of the relevant statute and regulation are identical to those currently in force.

Because, after careful consideration, this court finds that the plain language of the statute, 5 U.S.C. § 8331(20) (2000), and the regulation, 5 C.F.R. § 831.982 (2001), are clear and unambiguous when establishing the definition of LEO to be used for determining entitlement to LEO credit, Mr. Buckley clearly meets the applicable statutory standard. Moreover, because the appellate court has not articulated a precise, binding alternate or fixed standard, this court believes that it should decide plaintiff's case based on the statutory definition. If Congress wishes to change or further define the definition currently offered in the statute, and on which the regulation is based, certainly it can do so. At the present time, however, a fact finding body, such as this one, is left to define a methodology for determining entitlement to LEO credit. This court believes that the simple words of the statute offer sufficient and clear guidance. However, as discussed below, based on the evidence offered at the trial, even when the factors established in *Watson* and *Bingaman*[18] are reviewed and some combination and selections from those cases is applied to the present case, the court finds that Mr. Buckley occupied a primary position as a DI. Because a lengthy, factfinding trial was held at which relevant facts were elicited, this court includes a discussion of the application of the factors in the event that the appellate court disagrees with this court's statutory construction.[19]

"The evaluation of and weight to be given to the various *Bingaman* [*Watson* and *Hall*] factors and the [evaluation of the] other evidence in the record are judgement calls that rest primarily within the discretion of the [fact finder]." *Hannon v. Dep't of Justice,* 234 F.3d 674, 681 (Fed.Cir.2000). Of course, the exercise of such discretion must be carried out in a way that is not arbitrary, capricious, or not in accordance with the law. Because when the Federal Circuit offered its formulas for determining LEO credit eligibility, it did not state that the factors identified

must be considered, did not establish the relative weight to be assigned to any such factor, and did not exclude the consideration of other factors, this court may balance the announced factors to determine which factors are more relevant to the question of whether the plaintiff performed law enforcement work.

Consistent with the statutory and regulatory definition of a "law enforcement officer," the court finds that the factor regarding whether the employee pursued or detained criminals is the most important factor for evaluating eligibility for LEO credit. Second, the factors related to whether the job is physically demanding, and whether the officer is exposed to danger are also highly relevant to the analysis of eligibility for LEO credit. In the court's opinion, the second and third *Watson* factors regarding age limits should be given less weight than the other *Watson* factors. Although youthfulness may be relevant to the ability to perform law enforcement duties (the "investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States," 5 U.S.C. § 8331(20) (2000), 5 C.F.R. § 831.902 (2001)), physical fitness is even more relevant and an older employee may be more "physically capable of meeting the vigorous demands of occupations which are far more taxing than most in federal service," than a younger individual. S.Rep. No. 93–948. Moreover, the absence of age limitations does not necessarily mean that in LEO job descriptions, a youthful and physically fit work force, although not mandated by Congress, is not desirable. Furthermore, the third *Watson* factor, whether there is a maximum entry age, is not particularly helpful to determine whether an individual is capable of performing law enforcement duties because it appears to be related to the desire to ensure that the employees have a full career prior to collecting any retirement pay. An older individual may be performing law enforcement

---

**18.** The court in *Hall* applied the *Bingaman* factors and did not mention the *Watson* case. After the trial and following the issuance of the *Watson* decision, the court invited both parties to submit supplemental briefs addressing the impact of the *Watson* factors. Both parties did so.

**19.** The court is appreciative of the excellent representation of their clients provided to the court during complex pretrial and trial proceedings by all of the counsel appearing in the case.

work for which he or she should receive credit. The statutory test centers on the nature of the actual work performed, not on the age of the employee performing the work. Thus, this court finds that the age limit factors, especially the maximum entry age, are less probative than the other factors identified in *Watson*.

The *Watson* court indicated that although the Circuit Court had never adopted the *Bingaman* factors or concluded that an employee who could satisfy all six *Bingaman* factors automatically would receive LEO credit, "the six *Bingaman* factors may also be considered as necessary and appropriate." 262 F.3d at 1303. The six factors listed in *Bingaman* were:

> (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects, giving Miranda warnings when appropriate; (4) works for long periods without a break; (5) is on call 24 hours a day; and (6) is required to maintain a level of physical fitness.

*Bingaman v. Dep't of Treasury*, 127 F.3d at 1436. *Bingaman* factor (1) regarding frequent direct contact with criminal suspects requires a similar evaluation to *Watson* factor (1). *Bingaman* factor (6) regarding physical fitness encompasses primarily the same determination as *Watson* factor (4), which also relates to physical fitness, but without the phrase "so as to require a youthful work force." However, questions regarding the youthfulness of the work force in the *Watson* factors are more explicitly addressed in *Watson* factors (2) and (3), which are related to age limits. The *Watson* court apparently believed that the authority to carry a firearm (*Bingaman* factor (2)), the interrogation of witnesses and suspects, including giving Miranda warnings (*Bingaman* factor (3)), the length of the work periods (*Bingaman* factor (4)) and whether or not the employee is on call twenty-four hours a day (*Bingaman* factor (5)) were relevant, but not dispositive.

Given the direction of the Federal Circuit to use a combination of factors, including those articulated in *Watson* and *Bingaman*, a trial court is left with the task of assessing the eligibility of a particular work series or even of a particular employee, such as Mr. Buckley, on a case by case basis. This is only true, of course, if the precedent suggests that the trial court should ignore the clear words of the statute and regulations, 5 U.S.C. § 8331(20) (2000) and 5 C.F.R. § 831.902 (2001), by resorting to the legislative history and the case precedent based on a review and an interpretation of the legislative history to elaborate on the statutory and regulatory definition.

At trial, although *Hall* and *Watson* had not yet been decided, there was substantial testimony relevant to the factors identified in *Bingaman* and *Watson*, because of the overlap between the factors identified in both cases, regarding the actual duties Mr. Buckley performed while he served as a DI with DEA. The plaintiff admits in his brief that "[i]n his first two years of service, Mr. Buckley largely performed cyclic review of drug manufacturers to insure that legal drugs were not being diverted to illicit channels. This was not law enforcement work." However, Mr. Buckley testified at trial that toward the end of 1974 or early 1975, he began performing criminal investigations, and that he spent at least seventy-five percent of his time conducting criminal investigations. In October 1979, the DEA instituted an official program called Operation SCRIPT which shifted the focus of the diversion program toward criminal investigations of pre-selected retail violators. In conducting these criminal investigations, Mr. Buckley testified that he frequently interviewed witnesses or suspects and that "after [he] identified a lot of them and [he] actually found out their real names and [he] ran their rap sheets and everything else, the vast majority of them had rap sheets for something, burglary, controlled drugs, you know, sale, use." Special Agent Edward Guillen, who worked with Mr. Buckley in New York from 1975 to 1979, testified that while working with Mr. Buckley, both he and Mr. Buckley were frequently in contact with persons who were suspected of violating the criminal laws of the United States. Gene Haislip, who, from approximately 1977 to 1979, served as the Director of Planning and Evaluation reviewing the activities of the di-

version program, and from 1980 until 1997 served as the head of the diversion program, testified that DIs generally have frequent contacts with persons who are suspected or convicted of crimes against the laws of the United States.

Mr. Buckley also testified that he gave *Miranda* warnings to individuals, when appropriate, and that he had occasion to give *Miranda* warnings "well over a hundred times" from 1975 to 1976 alone. James Geldhof, Mr. Buckley's supervisor in New York City from June 1978 until April 1979, stated that the DIs he supervised in New York City "Mirandized people as the need arose ...." Although Mr. Haislip testified that DIs did not routinely Mirandize people because DIs did not have the authority to arrest people, he admitted that there may have been some occasions when they gave *Miranda* warnings.

Regarding his work schedule, Mr. Buckley testified that:

> In criminal diversion cases, there are no normal hours. You work where the leads bring you. You work when you have to. We had regulatory responsibilities that we had to do, and some-there were many days that we—in the morning we'd hit a regulatory house, do what we had to do. And that evening we'd be out working on another case, doing interviews.

Mr. Buckley also testified to a case on which he worked which required him to conduct surveillance, as follows:

> Myself and two other Diversion Investigators had a van and had a videotape, and we spent-well, I think it four days altogether, Monday through Thursday, where we'd get there early in the morning, 5:30 in the morning, find a place for the van that we could get a good clear view of the clinic. And we taped it all day long of the crowds coming in, the crowds coming out, selling the drugs outside in the street. So I guess it was late in the afternoon. We didn't leave there until after dark with the van. So we did that for four days straight.

Mr. Buckley further testified that while working long hours, he sometimes could not take breaks because "if you were doing a surveillance, you weren't going to break the surveillance to take a break, you know. If you were doing interviews, you wouldn't stop to have dinner or something. You'd do the interviews whenever you could." Mr. Geldhof confirmed that for the DIs he supervised:

> the initial day was eight hours, but we spent a lot of time doing interviews of these people as the case required. A lot of times these people could only be interviewed at night. They may have been employed. A lot of times they were interviewed on weekends because that was the only time they were available. So whatever the case really required us to do, that's what they did.... And so—I mean, [the DIs] might have a[n] interview scheduled at night or on the weekends. We may have gotten a phone call at 3:00 or 4:00 in the afternoon and somebody became available that had to be interviewed, and we did that.

Special Agent Guillen stated that while he was working in New York City from 1975 to 1979, he "would be working pretty much a regular ten, twelve, fourteen hour days" and that when Mr. Buckley assisted the Special Agents, "he did work those hours similar to the agents." Furthermore, Mr. Buckley and Special Agent Guillen investigated registrants together and there were times when it was necessary for Mr. Buckley and Mr. Guillen to work long hours without a break while on surveillance because they:

> could end up going to a particular location ... where a physician would have normal posted hours, but it ended up so many people came to get the drugs and wouldn't leave until they actually got the drugs, that even if the regular hours might have been from two to six, it ended up that sometimes it went later into the evening, into eight or nine o'clock, until each patient got their particular box and/or prescription of drugs.

Although, on cross examination, Mr. Buckley stated that while he served as a DI, he was never directed by his supervisors to work outside his normal hours, he also testified that as a DI, he was on call for twenty-four hours a day and that he received calls from witnesses "at all hours." Mr. Buckley did

state, however, that he did not recall any specific occasions during which he received a call at home and was required to leave his home in connection with a case. Mr. Geldhof confirmed that DIs "were available 24 hours. They were available as to whatever the case required, and that was understood." In addition, while Special Agent Guillen was working with Mr. Buckley, Mr. Guillen understood that Mr. Buckley was on call all the time, and Special Agent Guillen did call Mr. Buckley at different times to accompany him. Ronald W. Buzzeo, a Diversion Program Supervisor, testified that DIs were not generally on call twenty-four hours a day. Although Mr. Haislip testified that the DEA did not order DIs to be on call twenty-four hours a day as part of their work, he also stated that, regarding on call duty, he was "[n]ot sure what may have been done at a local level that was not brought to my attention."

Moreover, Mr. Buckley testified that "[y]ou had to be in shape" to perform the duties of a Diversion Investigator and that the Diversion Investigator position was more physically demanding than "an office job." Mr. Buckley stated at trial:

[W]e had to pound the leather a lot. We had to go out and walk. We had to walk up five flights of stairs, six flights of stairs. We didn't consider that—I never considered it, you know, that I was just overwhelmed by the physical demands. It was firing and it was stressful on your body, so I guess physically demanding in that way, yes.

Mr. Geldhof described some of the physical activities the DIs performed:

If you were doing a search warrant of a residence, you were climbing through various areas. Or some of these search warrants were done in apartment buildings where, frankly, the sanitary conditions weren't real great. And you certainly

were climbing through areas and boxes and, you know, picking up things and basically doing the search warrant.

Mr. Haislip testified that the job of a DI was more physically demanding than "an ordinary job in headquarters."

However, at the time Mr. Buckley completed his training for the DI position, he was not required to pass any physical requirements. Mr. Geldhof also stated that he did not recall ever seeing any written physical standards for DIs. On November 8, 1988, Mr. Haislip wrote a memorandum to Thomas C. Kelly, a Deputy Administrator of the DEA, urging that OPM adopt physical standards for Diversion Investigators because "DEA does not have any approved physical standards for entry level Diversion Investigators." [20]

To attempt to further define the roles and responsibilities of the DIs, in January 1977, Donald E. Miller, Acting Deputy Administrator of the DEA, issued a memorandum (the Miller Memorandum) aimed to clarify DEA policy regarding the duties of DIs. The Miller Memorandum stated:

Effective immediately, Compliance Investigators [21] will not participate directly in:

(1) Undercover purchase of evidence (investigators may continue to control such cases they have developed involving illegal sale by a registrant, but call upon 1811 assistance for the actual undercover purchases. The 1811, of course, will control the actual circumstances of the buy situation, and the advisability of such an approach).

(2) Direct, register and pay informants—This does not mean 1810's may not interview sources of information, assist in debriefing of established informants relating to diversion or availabili-

**20.** The plaintiff points to information provided on the DEA website under the title of "Diversion Investigator, A Career Opportunity." Although this website explains that "the duties of Investigators frequently require arduous physical exertion," there is no evidence in the record which demonstrates that the representations made on the web site were approved by OPM or by DEA. *See* www.dea.gov/job/diversion/standards.htm (November 26, 2001). An excerpt of the 1992

Personnel Manual related to the physical requirements for a DI do not contain the same representations regarding the "arduous physical exertion" required of DIs found on the DEA website.

**21.** Diversion Investigators were previously known as "compliance investigators," but the two terms describe the same position within DEA.

ty of legitimate drugs, however, the controlling and paying of confidential informants will be conducted by GS–1811's;

(3) Conduct moving surveillance—There are limited occasions in which 1810's will conduct activity which may be considered surveillance, such as monitoring the number of patients entering a methadone clinic prior to examining records, however, 1811's will conduct activity such as following suspected diverters;

(4) Arrests and execution of search warrants—These activities will be conducted by 1811's. On *limited* occasions involving registrants, 1810's may be present after the area is secured, for technical assistance in their area of expertise of the case, i.e., identify the drugs present, identify records or documents important to the case, etc.

It is recognized that these criminal investigative functions may complement certain (compliance) investigations being handled by compliance groups in which possible criminal violations have been indicated. In those cases, Regional management should ensure 1811 support is provided in line with case load priority at the time. Additionally, 1810's should be utilized in all cases involving registrants, whether originated by 1810 or 1811 personnel.

(emphasis in original).

On June 18, 1984, after considering a restructuring of the 1810 position, the Administrator of the DEA at that time, Francis M. Mullen, Jr., issued a memorandum (the Mullen Memorandum), affirming the amended restrictions on the duties of DIs:

The following enforcement actions will *not* be conducted by 1810 personnel:

(1) Undercover activities of any kind;

(2) Execution of arrest or search warrant. The 1810 investigator may be present after the area has been secured in order to identify records, documents or drugs;

(3) Conducting of surveillances, either moving or stationary; and

(4) Developing, direction or paying informants. This does not deny the 1810

the ability to develop or receive information from registrants or drug industry officials who wish to lend their support to investigations or to provide information on diversion. An 1810 investigator may accompany 1811 personnel in the debriefing of informants when such debriefing takes place in a secure premises; for example, a DEA office, police station, etc.

(emphasis in original).

The restrictions established in the Mullen Memorandum were reiterated in the 1984 and the 1990 Diversion Investigator Manuals, as well as in the Diversion Investigator Manual testified to at trial as the current one, which was issued in 1996. On February 28, 1995, Mr. Haislip, then Deputy Assistant Administrator for the DEA, issued a memorandum to all domestic Special Agents in Charge, reiterating the DEA policies regarding the duties of DIs and stating:

Recently, there have been many questions concerning Diversion Investigator (1810) hiring, 1810 duties, etc. I would like to remind everyone that the 1810 work force continues to be required to work under the guidelines of June 18, 1984, issued by then Administrator Francis M. Mullen, Jr., (copy attached) which reiterated the 1977 Memorandum from Donald Miller, then Acting Deputy Administrator.

In this same memorandum, Mr. Haislip again listed the actions which the DIs were not supposed to perform.

Harold Wankel, who became familiar with the diversion program from January 1990 to October 1996 as Deputy Assistant Administrator in charge of the Office of Investigative Support and as Chief of Operations for DEA, stated that the purpose behind the Miller Memorandum was "to keep the Diversion Investigators out of harm's way and also to preclude them from getting engaged or involved in activities which they had not been trained in how to conduct or handle." Special Agent Guillen testified that during his searches, he ensured that the premises were secure and safe before a Diversion Investigator entered the premises to participate in the search.

Despite the restrictions imposed on DIs by the Miller and Mullen Memoranda, the evidence in the record shows that the DIs still encountered dangerous situations while performing their duties. Mr. Geldhof testified that although DEA policy, as expressed through the Miller and Mullen Memoranda, prohibited DIs from performing certain duties, the practice in the field was different from the stated policy. Mr. Buckley testified that he did not stand outside waiting for a Special Agent to secure the premises during searches, but that he entered the premises with the Special Agents. Mr. Geldhof also testified that when DIs participated in searches with a Special Agent, "basically they entered the location at the same time." Furthermore, even when the DIs fully complied with the restrictions set forth in the Miller and Mullen Memoranda, these restrictions did not entirely shield the DIs from encountering dangerous situations.

The Office of Planning and Evaluation, Planning and Inspection Division at DEA issued a report entitled "Evaluation of the Diversion Control Program" on May 1, 1983. After conducting "research, file review, interviews, quantitative analysis and the on-site review of actual operations," this report included the following findings:

> There is inherent danger in an 1810's job. Whenever an audit is conducted, the possibility exists, although remote, that a registrant or cohort may react unpredictably, at times becoming hostile or irrational. An audit at a Narcotics Treatment Program (NTP) can be particularly dangerous. NTPs are usually located in depressed areas, the clientele are suspicious of Government agents, and frequently illegal activities are suspected at these sites. Although the study team failed to find any recorded incidences of injuries to 1810s conducting audits, 1810 personnel related a number of situations where injuries could have occurred. Whereas the study team is concerned about the 1810's safety regarding their regulatory duties, we are particularly disturbed by the increased danger inherent in criminal investigations.... With OD's [the Office of Diversion's] aggressive entry into criminal cases the danger factor for 1810s increases substantially.

. . . .

While 1811 support varied from office to office, every 1810 group supervisor interviewed related at least one incident where the lack of agent support impacted a case.

. . . .

In effect DEA has created and is perpetuating a two tier enforcement program. One enforcement effort against practitioner diversion and one enforcement effort against all other drugs. The 1810 core group has in effect become defacto 1811s.

On June 14, 1988, Mr. Haislip wrote a memorandum to the Chief of the Congressional Affairs Section of DEA, explaining the hazards faced by DIs when interviewing "patients" of the professionals being investigated: "Because of drug use, [the patients'] behavior is seldom predictable. For the Investigator, the situation is at the least very stressful and can be extremely hazardous." On February 13, 1990, a diversion group supervisor wrote a memorandum to the Chief of the Planning and Policy Assessment Unit explaining that although prohibiting DIs from performing undercover activities was intended to protect the DIs:

> It is *far more dangerous* for Diversion Investigators to enter a Narcotic Treatment Program (NTP) or Methadone program, which often times treats hundreds of hard core drug addicts in major urban high crime areas (where many NTPs are located), to conduct a regulatory investigation, than it is to do undercover work in a doctor's office.

(emphasis in original).

In addition, Mr. Buckley testified that during one case, while a surveillance was in progress:

> a countersurveillance was done on us, and they probably spotted us during the week, who we were. And they came over and told us they were going to—if the van was back tomorrow, it's going to be burned and everyone of you in there is going to burned with it.

Although the diversion program targeted its investigations mainly at doctors and pharma-

cists who were professionals, Special Agent Guillen explained:

> When you keep in mind that the physician or the pharmacist or the registrant is in fact being investigated for criminal wrongdoing, for the distribution, the illegal distribution of dispensing of controlled substances, there is always the potential for danger.

> Many of the offices that we went to had armed guards in the office to maintain control of the patients, purportedly the patients who were in seeking prescriptions and/or drugs, as well as there was always the potential for the registrant himself or herself to be able to have a license to carry a weapon.

> . . . .

> Basically any time that you are dealing with someone who is involved in illegal— the distribution of illegal drugs or legal drugs for illegitimate purposes, yes, there was always an inherent danger.

Mr. Buckley never has had the authority to carry a weapon, to arrest individuals, to work undercover, or to execute search warrants. Before the Miller Memorandum was issued, Mr. Buckley directed informants and under present DEA policy, DIs now can register, direct, and pay informants.

Regarding age restrictions, Mr. Mahoney testified that he did not know of any maximum age for DIs. Mr. Buckley testified that there were no age limits on DIs once training was completed. A study of the Diversion Program conducted by DEA, issued on November 21, 1990, found that: "The 1811 Criminal Investigators are also subject to a maximum entry level age limitation (35 years) and to mandatory retirement provisions… In contrast, the 1810 Diversion Investigators are not subject to any restrictions on entry level age or to mandatory retirement." When questioned about this 1990 DEA study, Mr. Buckley testified that the findings regarding age limits for Special Agents and for Diversion Investigators are still true at the present time.

The evidence presented at the trial demonstrates that as a DI, Mr. Buckley frequently pursued criminals or suspects through his investigations, as opposed to guarding life or property, when he conducted his criminal investigations of the illegal diversion of licit drugs by doctors and pharmacists. In addition, Mr. Buckley's job involved physical demands and required physical fitness. As a DI, Mr. Buckley's position included frequent walking and climbing when he searched for potential witnesses and informants, as well as hauling evidence. Moreover, Mr. Buckley was exposed to danger when conducting his criminal investigations. Despite the official restrictions placed on Mr. Buckley by the Miller and Mullen Memoranda, Mr. Buckley faced hostile individuals when interviewing drug-seeking individuals, conducting surveillances, pursuing investigations in high-crime areas and participating in searches of locations occupied by hostile individuals who may have been armed. Thus, this court finds that based on the testimony and evidence presented at trial, Mr. Buckley has shown that he meets the first, fourth, and fifth factors set forth in *Watson v. Department of the Navy*, 262 F.3d 1292, all of which are somewhat subjective evaluations. Although the DI position did not have an early mandatory retirement age or a youthful maximum entry age, as discussed above, given the balancing to be made in the court's discretion, based upon the Federal Circuit's opinions in *Watson* and *Bingaman* and given the nature of Mr. Buckley's responsibilities and the work he performed, the identified age limits should be given less weight than the other three factors described in *Watson*.

The available evidence in the record relevant to the consideration of LEO eligibility under the *Bingaman* factors also supports Mr. Buckley's claim that his primary duties involved the investigation of criminals and suspects. Several witnesses at trial supported Mr. Buckley's testimony that he had frequent direct contact with criminals and suspects during his investigations (*Bingaman* factor (1)). Mr. Buckley frequently interrogated witnesses to obtain information regarding the targets of his investigations, and he gave *Miranda* warnings when appropriate (*Watson* factor (1) and *Bingaman* factors (1) and (3)). The evidence shows that Mr. Buckley worked long hours (*Bingaman* factor (4)), including evenings and weekends

to conduct his investigations and that when he conducted surveillances over a period of time, he could not take a break without breaking the surveillance. Mr. Buckley also received calls after normal working hours from his colleagues and associates regarding his investigations, as well as from witnesses and informants. Although Mr. Buckley may not have been directed to be available on call, in order to meet his job description, Mr. Buckley understood that he needed to be available whenever the case required him to be available (*Bingaman* factor (5)). As stated above, Mr. Buckley's job entailed physical demands, although DIs were not required to pass any physical fitness tests (*Watson* factor (4) and *Bingaman* factor (6)). Although Mr. Buckley was not authorized to carry a firearm, this factor should not be dispositive for the determination of whether Mr. Buckley performed law enforcement work, and was discounted by the *Watson* court. Upon consideration of the factors set forth in both *Watson* and *Bingaman* and the discussion of those factors in *Hall*, the court finds that Mr. Buckley has satisfied the factors that are most critical for eligibility for LEO status and that, given the overall scope and depth of his actual duties, he, in fact, performed law enforcement work. Therefore, Mr. Buckley has established that he occupied a primary position as a Diversion Investigator.

## C. Secondary Positions

As stated above, in addition to the transfer requirement, an employee seeking LEO credit must show, if the employee has occupied multiple secondary positions after the initial transfer from a primary position, that he or she "has been continuously employed in secondary positions since transferring from a primary position without a break in service exceeding 3 days . . . ." 5 C.F.R. § 831.904(a)(2) (2001). Plaintiff argues that the court should not re-consider whether Mr. Buckley's supervisory positions qualify as secondary positions because "[w]ith respect to Mr. Buckley's service up to 1989, OPM has

determined it is law enforcement service and has so credited him. OPM found that he served as a law enforcement officer. These coverage decisions are final and may not be disturbed. *See* 5 C.F.R. § 831.911(e) (1999)." In response, defendant contends that "pursuant to *Bingaman*, as well as the Supreme Court's decision in *Harper v. Virginia Department of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), concerning the retroactivity of judicial interpretations of law, Mr. Buckley must demonstrate that the employees he supervised during this period were LEOs within the meaning of *Bingaman*." [22] Therefore, defendant argues that OPM's prior approval of LEO credit using pre-*Bingaman* and now also pre-*Watson* standards, in the secondary supervisory category is not sufficient for meeting plaintiff's burden to show that he continuously occupied secondary positions after his transfer from a primary position.

As an initial matter, the plaintiff must meet the threshold requirements for receiving credit in a secondary position under 5 C.F.R. § 831.902 (2001), which provides that a secondary position must be: (1) "clearly in the law enforcement or firefighting field"; (2) "an organization having a law enforcement or firefighting mission"; and (3) either supervisory or administrative. As DEA investigators, DIs are clearly in the law enforcement or firefighting field and the DEA is clearly an organization having a law enforcement mission. Defendant does not claim that the plaintiff has not met these requirements. Therefore, the court finds that all of plaintiff's secondary positions are clearly in the law enforcement field and that DEA has a law enforcement mission.

As discussed above, under the regulations in effect from 1981 until 1987, the provision waiving consideration of the transfer requirement after an initial determination that the employee has satisfied the transfer requirement does not satisfy plaintiff's burden to show that his supervisory positions from 1979

---

**22.** In *Harper v. Virginia Department of Taxation*, the United States Supreme Court held:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be

given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rules.

509 U.S. at 97, 113 S.Ct. 2510.

to the present are secondary positions. *See, e.g.,* 5 C.F.R. § 931.903(c)-(d) (1987). The provisions in effect from 1981 until 1987 exempted an employee from the obligation to prove that he or she met certain transfer requirements, but the transfer requirements described under the former provisions from 1981 to 1987 are distinct from the transfer requirement imposed after 1987, which the plaintiff is obligated to meet in the present case. In addition, for the same reasons which apply to the discussion regarding occupation of a primary position, the doctrines of judicial estoppel and collateral estoppel do not preclude the reconsideration of whether Mr. Buckley continuously occupied secondary positions after his transfer from a primary position.

## 1. Secondary Group Supervisor Position

In 1979, Mr. Buckley transferred from his primary position to the position of group supervisor. Mr. Buckley held the position of group supervisor during two time periods after his initial transfer from a primary position until the time period for which he seeks secondary administrative credit, the first from 1979 until 1983 and again from 1985 until 1988. For both of these time periods, Mr. Buckley must prove that the position of group supervisor satisfies the definition of a secondary supervisor position—that he served "as a first-level supervisor of law enforcement officers or firefighters in primary positions ...." 5 C.F.R. § 831.902 (2001).

As a group supervisor, Mr. Buckley was the first-level supervisor for a group composed mostly of DEA Diversion Investigators. To determine whether the DIs he supervised were law enforcement officers in primary positions, the definition set forth in the plainly worded statute and the regulations must be applied because the language of the statute is clear. In addition, as undertaken above, the court discusses the application of the *Watson* and *Bingaman* factors to plaintiff's case to determine whether those individuals Mr. Buckley supervised were performing LEO duties. Thus, the DIs Mr. Buckley supervised occupied primary posi-

tions if their primary duties were the "investigation, apprehension, or detention" of criminals or suspects. *See* 5 U.S.C. § 8331(20) (2000); 5 C.F.R. § 831.902 (2001).

As discussed above, the basic reasons for the existence of the DI position were to conduct criminal investigations of individuals suspected of illegally diverting controlled drugs into the illicit drug market. Ms. Brophy testified at trial and worked under Mr. Buckley's supervision from 1979 to 1980. In addition, Mr. Buckley supervised Mr. Mahoney while Mr. Mahoney was working on the *Witt* case [23] from 1980 until 1983. Another DI, Joanne Chiavaro, worked for Mr. Buckley from 1981 to 1983 and again in 1985. Regarding the duties of the DIs Mr. Buckley supervised, Mr. Buckley testified that "as a group ... seventy to eighty percent of the time was spent on criminal investigations." Ms. Brophy confirmed that she spent "probably in excess of seventy percent" of her time conducting criminal investigations. Specifically, among Mr. Buckley's group members:

> Some people just—all they wanted to do was the criminal investigations. And there were others who wanted to do regulatory. And those who did criminal thought that was wonderful to have people do the regulatories because we only had to do X amount each year.... So if you had somebody to do the regulatory investigations, another person could spend 100 percent of their time on criminal investigations.

In conducting these criminal investigations, Mr. Buckley stated:

> The investigators [I supervised] did the same things I did while I was an investigator. They went out and they developed—tried to develop witnesses. They tried to develop leads. They gathered evidence. They submitted the evidence. They tried to develop informants. They tried to put together a case that could be prosecuted.

Ms. Chiavaro, Ms. Brophy and Mr. Mahoney, who all served as DIs under Mr. Buckley's supervision during his two tours as a group supervisor, corroborated Mr. Buckley's description of their duties by describing the tasks they performed in specific cases.

**23.** *See Witt v. United States,* 831 F.2d 283 (2d Cir.1987) (table).

In addition, the evidence shows that the DIs in Mr. Buckley's group also conducted surveillance and participated in conducting searches of various premises for evidence of criminal activity. The evidence in the record demonstrates that the DIs supervised by Mr. Buckley spent a majority of their time investigating and aiding in the apprehension of criminals or suspected criminals, and that, therefore, they were law enforcement officers in primary positions. Thus, the court finds that as a group supervisor from 1979 until 1983 and from 1985 until 1988, Mr. Buckley occupied a secondary supervisory position, within the meaning of 5 C.F.R. § 831.902 (2001).

Although the court finds that the plaintiff's satisfaction of the statutory and regulatory standard is sufficient for proving that his tours as a group supervisor were secondary supervisory positions, the court also considers whether the DIs supervised by Mr. Buckley were law enforcement officers in primary positions under the factors discussed in *Hall, Watson* and *Bingaman*. The DIs working under Mr. Buckley's supervision performed similar duties and had similar responsibilities to Mr. Buckley when he occupied the DI position.

First, the DIs supervised by Mr. Buckley worked significantly more than forty hours a week, including weekends. Some surveillances would last several hours at a time during which the DIs would not take breaks. Mr. Buckley testified that he never directed his team to work outside of regularly scheduled duty hours because "[t]hey'd do it on their own." Second, these DIs had frequent contacts with persons who were suspected of violating the criminal laws of the United States. Third, the DIs in Mr. Buckley's group gave *Miranda* warnings, which they could read from a card containing the *Miranda* warnings that was provided to them by DEA. Fourth, Mr. Buckley testified that his DIs were on call twenty-four hours a day and that "[t]hey were called by people they were investigating, and I called them too." Judge Denise Cote, now a United States District Court Judge in the Southern District of New York, who at the relevant time was an Assistant United States Attorney, stated at trial that while she was working on the

Witt case with Mr. Mahoney, she felt "free to call him at anytime and certainly on weekends" in connection with the case. Certain DIs working on the Witt case spent "ten hours a day" for months creating spreadsheets and compiling statistics from patient records in a war room in the United States Attorney's Office.

Fifth, the DIs supervised by Mr. Buckley performed physical tasks. When executing searches, DIs were required to carry boxes of records and other evidence. Mr. Buckley stated that the DIs he supervised:

> had to be in good shape. They worked long hours. I still went out with them whenever I could to these locations, and I can tell you that going up and down the old brownstone houses out in Brooklyn, looking for people, you know, took a lot out of you after a while.
>
> . . . .
>
> ... The search warrants, you had a crowd of people. You had agents. You had investigators. I mean, there were boxes to be lifted, there was [sic] things to be done.

Ms. Brophy also described certain activities she was required to perform as a DI which she considered physically rigorous: "The ability certainly working in New York City in the areas we worked to climb upstairs in buildings that had never seen elevators. I guess, the ability to sit for quite a few hours in a car while doing surveillance." Although the standard DI training had physical training programs, the DIs were not required to take physical training tests.

Although the Miller and Mullen Memoranda directed restriction of the duties of the DIs supervised by Mr. Buckley, these DIs still faced potentially dangerous situations. Ms. Chiavaro recounted an exemplary incident when she was serving a grand jury subpoena to an individual. Ms. Chiavaro testified:

> We went up to talk to [the patient], identified ourselves, told him that we needed to talk to him about his involvement with the clinics. He got very upset and very hostile. We went to show him our identifications as to who we were. He grabbed my credential, didn't want to give them back

to me, was screaming at us and telling us to get out. We did eventually calm him down to some degree and took our—took back my credentials. And we did eventually leave, left him the grand jury subpoena. . . .

Ms. Chiavaro also explained that she took certain precautions while she was conducting interviews in her criminal investigations because:

> The general public does not understand the difference between a Diversion Investigator and a Special Agent. They just know that you're from DEA. The general public assumes that you are armed and I did nothing to let them think that I wasn't. In fact, I would make sure that my purse was always kind of bulging and I would make sure that I—if we were interviewing someone in a restaurant or at their residence, I would make sure when I put it down it made a lot of noise, that you could tell that it was heavy so that they would assume that there was a firearm in my purse.

On cross examination, Ms. Chiavaro testified that she entered dangerous areas even though she knew in the back of her mind that she was not required to go to a place she thought was dangerous. Ms. Chiavaro also acknowledged that when conducting a search the agents would serve the search warrant, and the DIs "would follow them in" after "a few minutes delay most of the times." However, Mr. Mahoney stated that when a search warrant was executed, Mr. Mahoney would enter the premises at the same time as the Special Agents. In undercover situations, Ms. Chiavaro would monitor the situation through eavesdropping equipment, and if there was a problem, she would call the agent or police officer to enter the scene. In Mr. Buckley's group, some DIs were not comfortable performing criminal investigations, so he assigned regulatory cases to those DIs and allowed other DIs in his group to focus entirely on criminal investigations.

The evidence shows that, similar to Mr. Buckley's service as a DI, DIs supervised by Mr. Buckley more frequently pursued criminals, as opposed to guarding life or property, performed physical tasks that were demand-ing and were exposed to dangerous situations despite the restrictions apparently imposed for their safety. Furthermore, the DIs in Mr. Buckley's group had frequent direct contact with criminals when interviewing witnesses, developing informants, and aiding in the apprehension of the criminal targets who were illegally diverting controlled drugs. These DIs also interrogated witnesses and suspects and gave Miranda warnings when appropriate. DIs worked a substantial amount of hours to complete their investigations and were unable to take breaks when conducting long surveillances or extensive searches. These DIs made themselves available to their supervisors, witnesses, and informants, as the case required, twenty-four hours a day. Although DIs have never been authorized to carry a firearm and have not been subject to an early mandatory retirement age or a youthful maximum entry age, these factors are not dispositive for determining whether the DIs supervised by Mr. Buckley occupied primary positions. In considering the evidence as a whole, even under the *Watson* and the *Bingaman* factors, the DIs in Mr. Buckley's group performed law enforcement work, using the full range of criminal investigative tools to investigate and aid in the apprehension of criminals and suspects involved in illegal drug traffic.

## 2. Secondary Administrative Positions

### a. Staff Coordinator

 From 1983 until 1985, Mr. Buckley occupied the position of Staff Coordinator in the Office of Diversion at DEA headquarters in Arlington, Virginia. Under the second transfer requirement of continuous employment in secondary positions, Mr. Buckley must prove that his position as Staff Coordinator satisfies the definition of a secondary position under 5 C.F.R. § 831.902 (2001). A secondary position must be either administrative or supervisory. The plaintiff alleges that Mr. Buckley's position as Staff Coordinator qualifies as a secondary administrative position. Under the applicable regulations, a secondary administrative position is "an executive, managerial, technical, semiprofessional, or professional position for which experience in a primary law enforcement or

firefighting position, or equivalent experience outside the Federal government, is a prerequisite." 5 C.F.R. § 831.902 (2001). To prove the prerequisite requirement, Mr. Buckley must demonstrate that: (1) as a DI, he had experience in a primary LEO position; and (2) that such experience was a mandatory prerequisite of his secondary administrative position. Regarding the administrative credit requirement, defendant argues that "Mr. Buckley has failed to satisfy his burden of proving that LEO experience was a prerequisite for the Staff Coordinator position ...."

As Staff Coordinator, Mr. Buckley monitored six field offices and coordinated their investigative activities with headquarters and between the offices. Mr. Buckley testified that Mr. Haislip and Mr. Buzzeo selected him for the Staff Coordinator position. Mr. Buzzeo testified that he was either the recommending or the selecting official for the position of Staff Coordinator and that in evaluating Mr. Buckley, he considered:

the types of investigations [Mr. Buckley] had performed while he was stationed in New York, criminal cases, regulatory investigations ... [b]ecause the field involvement with these types of cases and the need for somebody to monitor those activities to make sure they had sufficient resources, training, whatever it was that was needed in order to complete an investigation.

Regarding the position of Staff Coordinator, Mr. Buzzeo, who held various Diversion Investigator Program supervisory positions, provided the following testimony:

Q. ... Would [Mr. Buckley] have been able to perform the job successfully without his criminal investigative experience?

A. I don't believe that he would have been able to perform that function successfully.... [W]e needed somebody in headquarters who had the experience in either conducting or monitoring those types of investigations and that could lend assistance to the field, whether it was in resource, training, improvements in training, coordinator between the divisions, so we wanted somebody who had that type of experience.

Mr. Buzzeo also testified that criminal investigative experience was a prerequisite for his selection or recommendation of Mr. Buckley for the position of Staff Coordinator. Likewise, Mr. Buckley explained why criminal investigative experience was necessary to perform the job of Staff Coordinator successfully as follows:

You had to know what [the diversion field offices] were doing. You had to know—have the experience to be able to—when they give you a report or they tell you they need money for something, you have to make a call on it yourself. If you've never done it, you could just sign off on it all the time. You have to know also, if they're asking for resources, based on your experience that—which resources they need and which they don't.

Furthermore, the position description for Staff Coordinator lists several duties requiring extensive knowledge of the activities that DIs perform in the field. Specifically, Staff Coordinators are expected to prepare "basic and advanced training material, and technical advice to the field." Regarding the requirements for the position of Staff Coordinator, the position description states:

Thorough knowledge of these Headquarters programs as well as field investigative activity involving these areas is required.

. . . .

The incumbent of this position must possess a thorough knowledge of law enforcement as it pertains to the diversion of legitimately produced controlled substances and is required to have an in-depth knowledge and experience in all aspects of diversion control.

Because Mr. Buckley's position as a DI qualifies as law enforcement officer experience, and because the evidence demonstrates that "in-depth knowledge and experience in all aspects of diversion control" were required to perform the Staff Coordinator position, the court finds that law enforcement experience was a mandatory prerequisite to the position of Staff Coordinator.

**b. Deputy Chief of Diversion**

 From 1988 until 1991, Mr. Buckley occupied the position of Deputy Chief of Di-

version, and when Diversion split into chemical operations and drug operations in late 1989, Mr. Buckley assumed the responsibility for chemical operations. The plaintiff claims that Mr. Buckley's position as Deputy Chief qualifies as a secondary administrative position by alleging that "Mr. Buckley has presented sufficient evidence that his law enforcement experience was a prerequisite for the deputy chief position." As Deputy Chief of Diversion, Mr. Buckley described his job duties as follows:

Well, I had staff coordinators working for me who—in my old position, when I was there as a staff coordinator, I had so many offices to monitor and to coordinate with. I was overseeing all those coordinators, and at that time we were monitoring diversion activities on a worldwide basis.

. . . .

I had to—part of my duties as the deputy chief is I had to approve buy-money. I had to approve reverse undercover situations. . . . It couldn't have been done without—somebody who didn't have experience in that field.

To prove that Mr. Buckley's position as the Deputy Chief was a secondary position, the plaintiff offered the testimony of Ronald W. Buzzeo, a Diversion Program Supervisor. Regarding his participation in the selection of Mr. Buckley for the Deputy Chief of Diversion position, Mr. Buzzeo testified:

Q. How about his selection as the position of deputy director? Would Mr. Buckley have been able to perform his job successfully without his experience, his criminal investigative experience?
A. I don't believe so. . . . It would involve working both criminal cases and regulatory cases, both domestic and international activities, and it was felt that we needed somebody with John's experience in that position. As I said, whether I was the selecting official or the recommending official, we were looking for somebody who had experience in investigations with either chemicals or drugs.

Mr. Buzzeo also stated that criminal investigative experience was a prerequisite for his selection or recommendation of Mr. Buckley for the Deputy Chief position.

Defendant points out that Mr. Buzzeo testified that he did not recall whether he was the recommending or the selecting official and argues that "[a] recommending official, at most, can proffer an opinion as to whether an applicant or employee has qualities that are perceived by him or her as beneficial for the new position, but that person is not qualified to articulate what the prerequisites of the position are." Recommending officials, however, must know the prerequisites for a position in order to make effective recommendations.

Although the previous determinations by OPM are not being accorded preclusive effect in the present case, OPM's approval of Mr. Buckley's request for secondary administrative credit for the Deputy Chief position is relevant to the issue currently before the court. Mr. Buckley occupied the position of Deputy Chief of Diversion from 1988 until 1991. On August 27, 1992, OPM granted LEO credit to Mr. Buckley from 1988 until 1989 in the secondary administrative category. In addition, regarding Mr. Buckley's service in the Deputy Chief position from 1989 until 1991, Ms. Fulmore wrote a memorandum on July 29, 1994, recommending to JMD that Mr. Buckley's service be credited by stating: "Since OPM had determined that DI Buckley's service in this position met the definition of an administrative position, continued law enforcement coverage in the administrative category for this service is recommended." The provisions of 5 C.F.R. § 831.902, which were in effect from 1988 until 1991, governed OPM's approval of secondary credit, Ms. Fulmore's recommendation of secondary credit, and also govern the court's current consideration of whether Mr. Buckley's position as a Deputy Chief qualifies as a secondary position. Because Mr. Buckley's only experience in a primary position was as a DI, OPM and Ms. Fulmore must have determined that Mr. Buckley's DI experience met the "mandatory prerequisite" requirement for the Deputy Chief position. Because the court finds that Mr. Buckley's experience as a DI qualifies as experience in a primary law enforcement position, and because the evidence shows that Mr. Buckley's DI experience was a mandatory prerequisite

for his Deputy Chief position, the court finds that Mr. Buckley's service as a Deputy Chief of Diversion is a secondary administrative position within the meaning of 5 C.F.R. § 831.902 (2001).

## c. Inspector

██ The final position in Mr. Buckley's long career at DEA is his position at the Office of Inspections. In 1991, Mr. Buckley transferred laterally from the position as Deputy Chief of Diversion into the Office of Inspections, where he was working at the time of trial. The plaintiff also claims that the Inspector position qualifies as a secondary position in the administrative category by alleging that "his criminal investigative experience was a prerequisite for the job." Consequently, the plaintiff must meet the "mandatory prerequisite" requirement regarding his Inspector position.

According to Mr. Buckley, as an inspector, he "visit[ed] DEA offices around the world to evaluate if they're complying with DEA policies and procedures and how effective and how efficient they're doing things." Mr. Buckley testified that he could not have performed the job of inspector without a criminal investigative background. Special Agent Guillen, who spent fifteen months in the Office of Inspections with Mr. Buckley, also testified that he does not believe the job of inspector could be performed successfully without a background in criminal investigations.

Retha Fulmore, who has worked in OPM from 1972 to the present and was responsible for reviewing applications for LEO credit "to determine if the package met the criteria for the Drug Enforcement Administration to make a recommendation to the Office of Personnel Management for a decision." Ms. Fulmore reviewed Mr. Buckley's application for LEO credit for his service as an inspector and as part of her review, she considered a March 28, 1994 letter written by Mr. Haislip on behalf of Mr. Buckley. In this letter, Mr. Haislip wrote:

Mr. John Buckley was recommended for the position of Inspector (GS–1810/14) by the Office of Diversion Control due to his extensive experience in conducting, coordi-

nating, and supervising criminal investigations. Mr. Buckley would not have been recommended to fill this position without such experience and I have not recommended any Diversion Investigator to participate in the Inspection Program that has not had criminal diversion experience.

The knowledge and experience of criminal investigations was a mandatory prerequisite since his everyday duties require the continuous application of the techniques acquired through such experience.

Ms. Fulmore testified that she "felt that since [Mr. Haislip] did not make the selection for these positions, he could not make that statement. Mr. Haislip could make a recommendation, but he did not make the selection for these positions." According to Ms. Fulmore, the Deputy Administrator, the chairperson of the Career Board, makes the selections for positions at the grade fourteen level and above. To verify the representations made in Mr. Haislip's letter, on April 4, 1994, Ms. Fulmore wrote a letter to Sidney Hayakawa, Career Board Secretary, requesting information pertinent to Mr. Buckley's application. In this letter, Ms. Fulmore stated:

[T]he positions which the employee has either held or now holds, and for which law enforcement coverage is being requested based on the view that criminal investigative experience and knowledge is mandatory for successful performance of the position. Since the Career Board makes the selections for positions at the grade 14 level and above, a confirmation advising that criminal investigative experience was the selection criteria for appointment to these positions is needed to concur with Mr. Haislip's statements.

In response to Ms. Fulmore's letter, on April 7, 1994, Mr. Hayakawa wrote a memorandum which stated:

Reference is your memorandum dated April 4, 1994 requesting the Career Board to certify that promotions of Supervisory Diversion Investigators to the GM–14 grade level are based on criminal investigative experience.

The Career Board cannot so certify. The rating factors for promotion to GM–

1810–14 are listed in Section 2250.77 of the Personnel manual and criminal investigative experience is *not* one of the specified rating factors.

As you are aware, all promotions are based on competitive procedures, and the Career Board considers a variety of factors (e.g., recommendations made by the Office Head, time on the job, diversity of experience, date of last promotion, date of last assignment, annual evaluations, past disciplinary actions, etc.,) in making their selections. Unless the applicant submits a listing of his/her criminal investigative experience on the DEA–369 or on a separate memorandum, the Career Board has no knowledge of their actual participation or experience in these criminal cases. Additionally, the Career Board has not and will not be placed in a position to verify and certify that the applicant's listed criminal investigative experiences are valid. The applicant's immediate field supervisor should be the certifying official in this matter.

Based on the above, the Career Board does not use criminal investigative experience as a selection promotion criterion for GM–1810–14. While, in its deliberations, the Career Board gives appropriate consideration to all relevant experiences, criminal investigative experience is not "a primary factor in the selection process."

(emphasis in original).

Section 2250.78 of the 1992 Personnel Manual, which is referenced in the memorandum by Mr. Hayakawa, lists the rating factors which are considered for promotions to grades thirteen and above. The rating factors listed are: (1) Experience; (2) Supervisory Performance Appraisal; (3) Awards and Recognition; (4) Education; and (5) Training. The rating schedule used to evaluate candidates for DI positions in grades twelve to fifteen provides four sub-factors under the "Experience" category. The fourth sub-factor provides that the selecting official must consider "[w]ork experience in conducting Diversion Control investigations: in developing investigative requirements; and tasking."

The current position description for a Diversion Investigator/Inspector provides: "Incumbent, based on wide exposure and extensive investigative experience, conducts, coordinates and supervises the systematic review of Drug Enforcement Administration programs world-wide to assess their impact to determine their effectiveness in attaining agency goals and objectives." Mr. Buckley testified that the position description he received when he first arrived at the Office of Inspections contained different language and that he did not receive the revised position description until late 1993 or early 1994. According to Mr. Buckley, his initial position description stated: "Incumbent, based on his wide exposure and extensive criminal law enforcement experience, conducts, coordinates and supervises the systematic review of all Drug Enforcement Administration programs world-wide to assess their impact and to determine their effectiveness in attaining agency goals and objectives."

In addition, the plaintiff points to a letter from Mr. Haislip, who was the Deputy Assistant Administrator of the DEA at the time Mr. Buckley was applying for LEO credit as an Inspector. On March 28, 1994, Mr. Haislip wrote a letter in support of Mr. Buckley's application for LEO credit and stated: "The knowledge and experience of criminal investigations was a mandatory prerequisite [of the Inspector position] since his everyday duties require the continuous application of the techniques acquired through such experience." At trial, however, he attempted to explain the representations he made in his March 28, 1994 letter and tried to explain that when he evaluated individuals for a recommendation for the Inspector position, he did not inquire whether the individual had spent more than fifty percent of his time performing criminal investigations. Although at one time Mr. Haislip believed that criminal investigative experience was a mandatory prerequisite for the Inspector position, at trial he indicated he did not consider whether a candidate had primary LEO experience within the meaning of 5 C.F.R. § 831.902 (1994) because he did not consider whether the individual's duties primarily (more than fifty percent) involved the investigation of criminals or suspects.

The plaintiff also relies on the testimony of Robert Grant, who served as a senior inspector on Mr. Buckley's team in the Office of Inspections. At trial, Mr. Grant testified that criminal investigation experience was a prerequisite for the position of inspector. Mr. Grant, however, stated that he did not hire inspectors as part of his job, although he "might suggest individuals to the Deputy Chief or the Chief Inspector for consideration."

Although the evidence and common sense demonstrate that criminal investigative experience is an asset to the Inspector position and, in fact, may have been one of the factors considered by the selection officials regarding Mr. Buckley, the plaintiff has failed to meet his burden of showing that experience in a primary law enforcement position was a mandatory prerequisite for the job of Inspector. The Memorandum from Mr. Hayakawa clearly states that "[w]hile, in its deliberations, the Career Board gives appropriate consideration to all relevant experiences, criminal investigative experience is not 'a primary factor in the selection process.'" If criminal investigative experience is not a primary factor to consider, this factor certainly cannot be a mandatory prerequisite for the position of Inspector. The evidence shows that certain recommending officials believed that criminal investigative experience was necessary to perform the job of Inspector, but the plaintiff has not demonstrated that primary LEO experience was a mandatory prerequisite for the position of Inspector. Thus, the plaintiff does not meet the requirements of 5 C.F.R. § 831.902 (2001) for the position of Inspector, and the court finds that Mr. Buckley's employment in an Inspector position cannot be considered a secondary administrative position.

Based on all the evidence presented and the discussion set forth above, the court finds that Mr. Buckley is entitled to LEO status during the time period he served in the Deputy Chief of Diversion position and for which he has not been credited from August 24, 1989 until June 30, 1991. The court finds that Mr. Buckley's service in the Inspector position from July 1, 1991 to the present does not qualify for LEO status. Consequently, the plaintiff is entitled to certain benefits flowing from his LEO status from August 24, 1989 until June 30, 1991.

### D. FLEPRA Section 403

■ The plaintiff also seeks the special rate of pay afforded to LEO's pursuant to FLEPRA section 403, 5 U.S.C. § 5305 note (2000). However, FLEPRA section 403 became effective "on the first day of the first applicable pay period beginning on or after January 1, 1992." FLEPRA section 403(b)(1). The court has found that the plaintiff is only entitled to LEO credit from August 24, 1989 until June 30, 1991. The plaintiff did not occupy an LEO position during the effective time period of FLEPRA section 403. Therefore, the plaintiff does not qualify for a pay adjustment pursuant to FLEPRA section 403. Additionally, FLEPRA section 403 does not provide for special rates of pay for LEOs in GS grades above GS–10. From January 1, 1992 onward, Mr. Buckley has occupied the position of Inspector, which is categorized at grade fourteen. Thus, plaintiff is not entitled to the benefits pursuant to FLEPRA section 403.

### E. FLEPRA Section 404

■ The plaintiff also seeks the special rate of pay afforded to LEO's pursuant to FLEPRA section 404, 5 U.S.C. § 5305 note (2000), which entitles LEO's posted for duty in one of eight specified metropolitan areas to premium pay. However, FLEPRA section 404 became effective "on the first day of the first applicable pay period beginning on or after January 1, 1992." FLEPRA section 404(b)(1). Since the court has found that the plaintiff is only entitled to LEO credit from August 24, 1989 until June 30, 1991, the plaintiff did not occupy an LEO position during the effective time period of FLEPRA section 404. Therefore, the plaintiff does not qualify for a pay adjustment pursuant to FLEPRA section 404.

### F. Overtime Pay

■ The plaintiff claims that he is entitled to overtime pay pursuant to 5 U.S.C. § 5542(a)(4) (2000), but does not request overtime pay prior to August 2, 1985 because

of the six-year statute of limitations. 5 U.S.C. § 5542(a) provides for premium pay "[f]or full-time, part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of 40 hours in an administrative workweek ... In excess of 8 hours in a day, performed by an employee ...." Law enforcement officers are eligible for this overtime pay and receive an amount equal to the greater of (A) one and one-half times the minimum hourly rate of basic pay for GS-10; or (B) the hourly rate of basic pay of the employee. *See* 5 U.S.C. § 5542(a)(4).

By its terms, the statute establishing overtime pay permits overtime pay only for "hours of work officially ordered or approved." 5 U.S.C. § 5542(a) (2000). The applicable regulations require that no overtime may be ordered or approved except by an officer or employee to whom such authority has been specifically delegated by the head of the department or agency. *See* 5 C.F.R. § 550.111(c) (2001). In determining whether overtime work has been "officially ordered or approved," a written directive or order to perform work beyond the forty hour work week satisfies the statutory standard and is considered "officially ordered or approved." *See Baylor v. United States,* 198 Ct.Cl. 331, 349, 1972 WL 20798 (1972) ("Although there is no evidence that any of the plaintiff guard privates were specifically 'ordered' in so many words to report to his assigned post 'a few minutes early,' it is apparent from the April 20, 1960 general directive to 'GSA GUARDS' mentioned hereinbefore that at least on one occasion each guard was instructed in writing that he 'should' do so .... [I]t appears that [the guards] reasonably understood and considered the instruction to be a command that obligated and required them to report to their assigned posts of duty a few minutes before the specified hour of their scheduled shifts."); *Bates v. United States,* 196 Ct.Cl. 362, 367, 371, 450 F.2d 886, 889, 891 (1971) (finding that the regulations and instructions requiring the employees to "report in uniform 15 minutes before the scheduled start of their shifts" constituted an order and approval of overtime work); *Byrnes v. United States,* 163 Ct.Cl. 167, 171, 174, 330 F.2d 986, 988, 990 (1963) (holding that a written directive including a statement that "it is expected that you will perform without extra compensation any overtime that may be necessary to make good cases and achieve effective results in our enforcement work" constituted an explicit expectation that amounted to "inducement and compulsion"); *Farley v. United States,* 131 Ct.Cl. 776, 780, 127 F.Supp. 562, 564 (1955) (holding that an employee working pursuant to a "regulation specifically requir[ing] that the officer remain on duty" is entitled to overtime pay for the time she was on duty in excess of forty hours per week).

In cases in which there is no explicit directive or order requiring work outside the forty hour week, overtime work may be considered "officially ordered or approved" if the employee was induced to perform overtime. *See Adams v. United States,* 162 Ct.Cl. 766, 781, 1963 WL 8610 (1963) (finding that the employing agency knew and approved the overtime work and that "[t]he evidence makes it abundantly clear that the [agency], as an entity, induced the overtime, and that the withholding of written authorization or approval was done overtly and as a matter of departmental policy"); *Manning v. United States,* 10 Cl.Ct. 651, 663 (1986) (finding that "plaintiff was clearly induced to put in overtime hours" because "[h]e was directly ordered by his Command to increase days and hours of the Special Service facilities at the base, yet at the same time suffered a steady loss of staff to help him keep the facilities open and running."). In *Anderson v. United States,* 136 Ct.Cl. 365, 1956 WL 8341 (1956), the Court of Claims considered a case in which the employing agency advised that an administrative work week would be limited to forty hours a week and that overtime would only be approved "under most unusual circumstances." *Id.* at 387, 1956 WL 8341. Despite the agency's announcement, the agency encouraged "voluntary overtime" and instructed inspectors to record their actual hours worked on daily reports which were used to rate and recommend the inspectors for promotions. *Id.* at 391–92, 136 Ct.Cl. 365. The *Anderson* court found that "every administrative device and the tone and content of instructions were so cast as to imply

(if not overtly to state)" that the inspectors could not effectively and acceptably perform their work within forty hours per week. *Id.* at 393, 1956 WL 8341.

In contrast, in *Albright v. United States,* 161 Ct.Cl. 356, 1963 WL 8497 (1963), the Court of Claims found that "a 'tacit expectation' is not equivalent to the statutory requirement of 'official order or approval.' " *Id.* at 361, 1963 WL 8497. In *Albright,* although plaintiffs were required by regulation "to report 15 minutes before their tour of duty began, . . . actually, they reported at least 20 minutes before." *Id.* at 358, 1963 WL 8497. There was no written order requiring the plaintiffs to report five minutes early, but it was tacitly understood between the plaintiffs and their supervisors that they should be available for duty twenty minutes before their scheduled shift. *Id.* at 361, 1963 WL 8497.

The evidence shows that Mr. Buckley worked more than forty hours per week throughout his career with DEA, including evenings and weekends, and did not receive any overtime pay for the hours he worked beyond the forty hour work week. Mr. Buckley testified that when he was a DI:

> I was putting down for the overtime, and they said, there is no overtime, you're not getting overtime. This was the New York office. So I said, well, how about comp time? They said, there's no comp time. You don't get that either. This is part of the job. When I did talk about putting it down on your record—you keep the biweekly straight on what your hours were—I was told that the biweekly—our time and attendance sheet had to jibe with our biweekly sheet. So if you were getting paid for 80 hours, . . . they'd staple your biweekly to that. And it better be 80 hours. It's not 90 hours because they don't jibe.

Because he was directed to keep his biweekly sheets consistent with his time and attendance sheets, Mr. Buckley claims that his biweekly sheets do not reflect the actual total hours he worked. Mr. Buckley has offered estimates reflecting the amount of overtime he allegedly worked. Mr. Buckley testified that while he served as a DI, he was never directed by his supervisors to work outside his normal hours. Furthermore, the plaintiff has not presented any evidence that he was ever given an order or directive throughout his career in DEA to work beyond the forty hour work week. There is also no evidence showing that the plaintiff would have received negative feedback if he had not worked overtime.

Although, according to the plaintiff, he informed someone that he was working overtime by attempting to "put down for the overtime," there is no evidence that any official with the authority to approve or direct overtime even had knowledge that the plaintiff was working overtime. Moreover, the evidence shows that certain Dis performed overtime voluntarily. Mr. Buckley testified that he did not direct his team to work outside of regularly scheduled duty hours because he "didn't have to. They'd do it on their own." When asked whether Dis received compensatory time, Mr. Mahoney stated:

> No, and we didn't cry about it. You know, we did the work, the work that had to be done. We did the work. We enjoyed ourselves. We enjoyed our work. We enjoyed doing this type of stuff, and we went around doing it. We knew very well that we could not put in for—we knew we couldn't put in because then I don't know what they would do. First of all, they would say no. you're not going to get paid. Then they might say—God forbid, they might say well, forget about it. Forget about doing this. Go back to doing the regulatory stuff.

Thus, the evidence shows that overtime work hours were not officially ordered or approved by DEA. The court, therefore, finds that the plaintiff is not entitled to overtime pay pursuant to 5 U.S.C. § 5542 (2000).

### G. Administratively Uncontrollable Overtime (AUO) Pay

 As an alternative to overtime pay, Mr. Buckley requests AUO pay, also from August 2, 1985 to the present, as restricted by the statute of limitations. AUO is permitted under 5 U.S.C. § 5545(c)(2) (2000), which provides:

(c) The head of an agency, with the approval of the Office of Personnel Management, may provide that—

. . . .

(2) an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled overtime, night, and Sunday duty, and for holiday duty. Premium pay under this paragraph is an appropriate percentage, not less than 10 percent nor more than 25 percent, of the rate of basic pay for the position, as determined by taking into consideration the frequency and duration of irregular, unscheduled overtime duty required in the position.

The applicable regulations governing the administration AUO pay clarify the criteria for eligibility for AUO. The regulations at 5 C.F.R. § 550.153(a) (2001) describe the situations in which overtime is administratively uncontrollable:

[T]he hours of duty cannot be controlled by such administrative devices as hiring additional personnel; rescheduling the hours of duty (which can be done when, for example, a type of work occurs primarily at certain times of the day); or granting compensatory time off duty to offset overtime hours required.

Although the evidence shows that the plaintiff performed duties which required such overtime work, including interviewing witnesses and providing assistance after full trial days, the plaintiff has presented no evidence which demonstrates that at least some of this overtime could not have been controlled by rescheduling the hours of duty to incorporate shifts during different times of the day when witnesses could be available. Regarding situations in which Mr. Buckley worked overtime to assist during trial, review records during an audit, or conduct extensive

searches, the plaintiff has not shown that some of this overtime work could not have been alleviated by hiring additional personnel. Furthermore, Mr. Buckley testified that he has received some compensatory time in various positions he has held, although primarily as an Inspector. The plaintiff has not demonstrated that providing compensatory time would not have been effective at offsetting the overtime hours required.

The plaintiff argues that regarding his position as a Group Supervisor, Mr. Buckley "remained in the office until every investigator, including the 1811s he supervised, returned." Although Mr. Buckley's choice to wait in the office for his team to return may have made him an excellent supervisor, and certainly contributed to reaching the goals of the diversion program, the plaintiff has not demonstrated that his decision to remain on duty was "a definite, official, and special requirement of his position," as required by 5 C.F.R. § 550.153(c)(1) (2001). In addition, Mr. Buckley has not presented evidence showing that he performed overtime waiting for his team as a Group Supervisor "not merely because it [was] desirable, but because of compelling reasons inherently related to continuance of his duties, and of such a nature that failing to carry on would constitute negligence." 5 C.F.R. § 550.153(c)(2).

Regarding his Inspector position, Mr. Buckley argues that the 1811 Inspectors all received AUO and that because he performed identical duties as the other Inspectors, his overtime was identically "administratively uncontrollable." The evidence shows that although Mr. Buckley performed many of the same duties of the other Inspectors, he could not serve on the shooting incidents team, which restricted its members to 1811's. The shooting incidents team is required to respond immediately whenever there is a discharge of a firearm in the field, so the members of this team face hours that are particularly unpredictable and difficult to control. Moreover, as noted above, the overtime Mr. Buckley has performed as an Inspector has been at least partially offset by the award of compensatory time, and Mr. Buckley has not shown that compensatory

time cannot effectively offset the overtime required in the Inspector position.

An additional requirement of 5 C.F.R. § 550.153 (2001) provides that:

[A]n employee is required to perform substantial amounts of irregular or occasional overtime work. In regard to this requirement:

(1) A substantial amount of irregular or occasional overtime work means an average of at least 3 hours a week of that overtime work.

(2) The irregular or occasional overtime work is a continual requirement, generally averaging more than once a week.

(3) There must be a definite basis for anticipating that the irregular or occasional overtime work will continue over an appropriate period with a duration and frequency sufficient to meet the minimum requirements under paragraphs [ (1) and (2) ] of this section.

5 C.F.R. § 550.153(b)(1)-(3). Mr. Buckley provided a table showing the number of overtime hours he worked from April 1989 until June 1991 in the Deputy Chief position and, at trial, provided general estimates of the overtime hours he worked at his other positions. To the extent that Mr. Buckley performed overtime work, Mr. Buckley has not specified the number of overtime hours which were administratively uncontrollable. As discussed above, the plaintiff has not shown that all of the overtime worked by the plaintiff in his Group Supervisor and his inspector positions was administratively uncontrollable. Thus, the plaintiff has not shown that he meets the duration and frequency requirements of 5 C.F.R. § 550.153(b). Because the plaintiff carries the burden to prove that he is entitled to AUO and because the plaintiff has not demonstrated that the overtime he worked was administratively uncontrollable, the court finds that the plaintiff is not entitled to AUO.

**24.** 5 U.S.C. § 5541(3) incorporates the definition of a "law enforcement officer" set forth in 5 U.S.C. § 8331(20) and analyzed in the discussion above.

### H. Availability Pay

As an alternative to either overtime premium pay and AUO, the plaintiff argues that he is entitled to availability pay pursuant to 5 U.S.C. § 5545a (2000), beginning in 1994 when the availability pay statute was enacted, to the present. The statute at 5 U.S.C. § 5545a establishes the criteria for eligibility for availability pay as follows:

(b) The purpose of this section is to provide premium pay to criminal investigators to ensure the availability of criminal investigators for unscheduled duty in excess of a 40 hour work week based on the needs of the employing agency.

(c) Each criminal investigator shall be paid availability pay as provided under this section. Availability pay shall be paid to ensure the availability of the investigator for unscheduled duty. The investigator is generally responsible for recognizing, without supervision, circumstances which require the investigator to be on duty or be available for unscheduled duty based on the needs of the agency. Availability pay provided to the criminal investigator for such unscheduled duty shall be paid instead of premium pay provided by other provisions of this subchapter ....

5 U.S.C. § 5545a. To qualify for availability pay, the employee must be an LEO. *See* 5 U.S.C. § 5545a(a)(2). In addition, an employee must meet the requirements of the applicable regulations. The regulation at 5 C.F.R. § 550.103 (2001) establishes the definition of a "criminal investigator" as "a law enforcement officer as defined in 5 U.S.C. § 5541(3) [24] and this section—(1) Whose position is property classified under the GS–1811 or GS–1812 series in the General Schedule classification system based on OPM classification standards ...." [25] The plaintiff has been classified as either the GS–1801 or the GS–1810 series, but not the GS–1811 or the GS–1812 series. Thus, by the plain terms of

**25.** The definition of a "criminal investigator" under 5 C.F.R. § 550.103 lists several other positions that qualify as a "criminal investigator" position. The plaintiff does not claim that he occupies one of those other positions.

the regulation, the plaintiff does not qualify for availability pay.

Plaintiff argues that:

Nowhere in the statute does Congress purport to limit availability pay to investigators in the GS–1811 or GS–1810 series. Rather, Congress's explicit definition of a criminal investigator incorporates the definitions of 5 U.S.C. §§ 8331(20) and 8401(17)[26] and limits it to those law enforcement officers involved in criminal investigations rather than apprehension or detention.

Although the availability pay statute does incorporate the definition of an LEO that is set forth in 5 U.S.C. § 8331(20) (2000), the statute does not state that LEO status is the only requirement necessary for entitlement to availability pay. Additional requirements for entitlement to availability pay were promulgated in the applicable regulations, and these regulations specifically do not support plaintiff's interpretation of the criteria for availability pay. The definition of a "criminal investigator" set forth in 5 C.F.R. § 550.103 (2001) establishes a discreet list of positions which meet the "criminal investigator" requirement, which also must be met in addition to the requirements under 5 U.S.C. § 5545a.

Plaintiff next argues that "he meets the definition of a criminal investigator under 5 U.S.C. § 5545a(a)(2) [ (2000) ] and, thus, that his position properly should be classified as a GS–1811." Although the court has found that the plaintiff has performed LEO work, the regulation does not permit the disbursement of availability pay to employees who have not been classified as a GS–1811. The regulation expressly requires that for availability pay, the employee must be classified as a GS–1811 and that this classification must have been properly determined. Because the plaintiff does not meet the regulatory definition of a "criminal investigator" for the purposes of entitlement to availability pay, the court finds that the plaintiff is not entitled to availability pay.

Plaintiff argues that judgment should be entered in his favor in the amount of zero dollars because such a judgment is within the power of the court and "the circumstances of this case are sufficiently unique to justify this result." Defendant maintains that this court should enter judgment in favor of defendant "because the relief requested by the Government, dismissal of plaintiffs' complaint, was granted, and the relief plaintiff Buckley requested, money damages, was denied."

Rule 54(c) of the Rules of the United States Court of Federal Claims (RCFC) (2002) states that, in this court, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Despite this court's finding that plaintiff Buckley is qualified for LEO credit for positions held between August 24, 1989 and June 30, 1991, plaintiff was unsuccessful in establishing each of the necessary elements to support his claims for back pay under FLEPRA. Plaintiff also failed to prove entitlement to back pay for overtime pursuant to 5 U.S.C. §§ 5542, 5547, AUO under 5 U.S.C. § 5545(c)(2), or availability pay under 5 U.S.C. § 5545a. Thus, plaintiff is not entitled to money damages for any of the claims presented to this court.

## CONCLUSION

Based on the above discussion, the Clerk of the Court is directed to enter **JUDGMENT** in favor of the defendant.

**IT IS SO ORDERED.**

---

**26.** The definition of an LEO established under 5 U.S.C. § 8401(17) (2000) applies to employees seeking benefits under the Federal Employees' Retirement System, which does not apply in the present case because Mr. Buckley's benefits would arise under the Civil Service Retirement System.